**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LEON D. BLACK**<br>445 Park Avenue, Suite 1401<br>New York, NY 10022<br><br>*Plaintiff*,<br><br>v.<br><br>**THE HOUSE COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM and**<br>2157 Rayburn House Office Building,<br>Washington, D.C. 20515<br><br>**JAMES COMER, in his capacity as Chairman of the House Committee on Oversight and Government Reform**<br>2410 Rayburn House Office Building,<br>Washington, D.C. 20515<br><br>*Defendants*. | Case No.: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Leon D. Black brings this action for declaratory and injunctive relief against the House Committee on Oversight and Government Reform ("OGR" or the "Committee") and its Chairman, James Comer, in his official capacity. This case concerns two subpoenas issued after Mr. Black voluntarily appeared for an interview in connection with OGR's investigation into Jeffrey Epstein: one demanding the production of private non-disclosure agreements and the other compelling Mr. Black's deposition testimony. The subpoenas are invalid to the extent they exceed OGR's delegated authority in seeking private information that bears no legitimate connection to OGR's legislative purpose. Additionally, the subpoenas would also expose women who value their privacy, who have no known or public connection to Epstein, who bargained for

confidentiality and have refused to release it, and who have no ability to protect themselves and their privacy before the Committee. OGR also lacks the statutory authority to enforce those subpoenas in federal court against Mr. Black. Mr. Black therefore seeks declaratory and injunctive relief preventing OGR from enforcing, threatening to enforce, or otherwise compelling compliance with the subpoenas.

Mr. Black alleges as follows.

## INTRODUCTION

1. Congress's power is not unlimited. Writing nearly seven decades ago in the heart of the Congressional Red Scare witch hunt, Mr. Chief Justice Warren wrote in *Watkins v. United States*, 354 U.S. 178, 187 (1957) that "[t]he power of the Congress to conduct investigations is inherent in the legislative process. That power is broad . . . But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress."

2. There is no justification here for such a sweeping and intrusive subpoena served upon a private citizen. Mr. Black supports the Congressional efforts to stamp out trafficking and to ensure that this country never has another Jeffrey Epstein. But Mr. Black has already testified to Congress that Epstein had nothing to do with drafting or creating any confidentiality agreements he may possess. He has also informed the Congress that Maxwell had nothing to do whatsoever with any such agreements.

3. Despite this, Congress has taken concrete investigatory steps to invade Mr. Black's private life and, worse yet, into the lives of people with whom he has or may have agreements, but who have informed Mr. Black through counsel that they want no part of this public fishing expedition. Mr. Black has already furnished the answers Congress ostensibly seeks. If there ever

was a limit on Congressional overreach, this must be it. Congress is pursuing Mr. Black for purely political gain, which is not a legitimate end of Congressional investigations.

4. On March 3, 2026, Chairman Comer of OGR sent Mr. Black a letter requesting that he appear for an in-person voluntary interview before the Committee. *See* Ex. A, March 3, 2026 Letter from Chairman Comer to Leon Black ("March 3 Comer Letter"). Chairman Comer identified the Committee's inquiry as focused on Jeffrey Epstein, Ghislaine Maxwell, sex trafficking, alleged federal investigative failures, and potential ethics issues involving elected officials. *Id*.

5. After extended discussions with the Majority Staff concerning the anticipated scope of the interview, and Staff's reassurance that the interview would be limited to publicly available documents, Mr. Black agreed to cooperate with that stated inquiry. Mr. Black voluntarily appeared on June 26, 2026, prepared to answer questions concerning his professional relationship with Epstein, the amounts he paid Epstein, and the professional services he paid for.

6. The interview did not proceed consistent with OGR's representations. Moments before Mr. Black's voluntary interview was set to begin, Chairman Comer publicly stated that the Majority intended to focus on two subjects: "NDAs," which are non-disclosure agreements, and Suspicious Activity Reports, which are confidential reports that financial institutions file with the U.S. Department of the Treasury. Neither topic had been identified to Mr. Black's counsel in the March 3 Comer Letter or in multiple pre-interview discussions regarding the anticipated scope of questioning. Nonetheless, Chairman Comer stated that OGR was entitled to know if "Jeffrey Epstein [was] involved in the NDAs, was he involved in writing, [and] was he involved in awarding funds to the women for the NDAs."

7. When Mr. Black's counsel objected to the Majority Staff questioning about NDAs, Chairman Comer immediately caused the Majority Staff to serve Mr. Black with two subpoenas. The first was a document subpoena (the "Document Subpoena") with an initial response date of July 10, 2026, later extended to July 24, 2026. *See* Ex. B, June 26, 2026 Document Subpoena of Leon Black (the "Document Subpoena"). The Document Subpoena commanded Mr. Black to produce, among other things, all NDAs to which he was a party. The second was a subpoena for a deposition with an initial appearance date of July 16, 2026, later extended to September 3, 2026. *See* Ex. C, June 26, 2026 Deposition Subpoena ("Deposition Subpoena"). Through counsel, Mr. Black ended his voluntary interview after he was served with the subpoenas.

8. The subpoenas reach well beyond Mr. Black and are, on their face, overbroad. As written, they compel production of a vast quantity of agreements of all kinds, including the disclosure of the unredacted identities and private circumstances of women who bargained for confidentiality, whose counsel have affirmatively declined to release Mr. Black from his confidentiality obligations, and who want no association with the Epstein scandal. These women are not before the Committee, received no notice from it, gave no consent to it, and were given no way to be heard.

9. Mr. Black fully complied with multiple requests in the Document Subpoena by written response dated July 24, 2026, and he complied in other respects in a manner consistent with Chairman Comer's identified legitimate legislative purpose. *See* Ex. D, July 24, 2026 Letter from Mr. Black to Chairman Comer ("July 24 Black Letter"). As to the latter, Mr. Black produced the only confidentiality agreement in which Epstein could have been "involved" because it is the only one executed while he was alive. This is what Chairman Comer stated he sought with the issuance of the document subpoena.

10. OGR responded to Mr. Black's submission by questioning his good faith. *See* Ex. E, August 18, 2026 Letter from Chairman Comer to Mr. Black ("August 18 Comer Letter"). While stating that the staff would follow up with counsel for Mr. Black, those talks have been fruitless. OGR has given no weight to the legitimate interests of the women involved, whose privacy they would trample. And they have left Mr. Black with a Hobson's choice: to surrender private and confidential information that OGR has no lawful authority to demand or to maintain his well-founded objections and face actual or threatened contempt proceedings and federal court enforcement of an overbroad subpoena. As such, this lawsuit seeks a judicial ruling that the subpoenas exceed legislative authority and are not enforceable.

11. This action presents two important and straightforward legal questions. First, whether OGR may compel production of private, confidential information about both Mr. Black and third parties that falls outside the scope of its delegated authority and lacks a sufficient connection to any valid legislative purpose. Second, whether OGR may enforce its subpoenas through civil litigation in federal court notwithstanding Congress's failure to authorize House committees to bring such actions against private citizens. Mr. Black seeks a declaration that the Document Subpoena and Deposition Subpoena are invalid and unenforceable, together with injunctive relief barring OGR from enforcing, threatening to enforce, or otherwise compelling compliance with those subpoenas in federal court.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States.

13. This Court has personal jurisdiction over the Committee because it is located in and operates from Washington, D.C., and the subpoenas to Mr. Black issued from the House Committee in this District.

14. This Court has personal jurisdiction over Chairman Comer because he maintains an office in Washington, D.C., and participated from this District in the issuance and threatened enforcement of the subpoenas.

15. The Court has authority to issue a declaratory judgment and order other relief that is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred in the District of Columbia.

**PARTIES**

17. Plaintiff Leon D. Black is an entrepreneur, investor, and philanthropist. Mr. Black founded Apollo Global Management ("Apollo"), one of the world's leading alternative asset-management and private-equity firms. Mr. Black served for 31 years as Apollo's Chief Executive Officer and Chairman and was responsible for the firm's growth into a major global investment enterprise. Over his career, Mr. Black has devoted substantial time and resources to civic, educational, cultural, medical, and philanthropic institutions. He served for approximately ten years on the Board of Trustees of Dartmouth College, approximately twenty years on the Board of Trustees of Mount Sinai Hospital, and approximately fifteen years on the Board of Trustees of the Metropolitan Museum of Art. Mr. Black also served as Chairman of the Board of the Museum of Modern Art and has long been one of that institution's most significant supporters. Mr. Black and his wife co-founded the Melanoma Research Alliance ("MRA"), which has become the largest private funder of melanoma research worldwide. MRA has been at the vanguard of the

immunotherapy revolution and has created a new paradigm for the treatment of over 30 cancers and millions of patients.

18. Defendant the House Committee on Oversight and Government Reform is a standing committee of the United States House of Representatives. Pursuant to Rule X of the Rules of the House of Representatives, the Committee has jurisdiction over, among other things, matters relating to federal civil service and government operations generally.

19. Defendant James Comer is a U.S. Representative for the State of Kentucky and currently serves as Chairman of the House Committee on Oversight and Government Reform of the United States House of Representatives. The subpoenas challenged herein were issued pursuant to Chairman Comer's authority and signed by him.

## FACTUAL ALLEGATIONS

**<u>OGR's Investigative Authority</u>**

20. OGR, like every House committee, possesses only the authority delegated to it by the House and must exercise that authority within the limits of the Constitution, federal statutes, and House Rules.

21. In 2025, OGR opened an investigation concerning Epstein and Maxwell, invoking its general oversight jurisdiction under House Rule X. That authority is broad but not unbounded: any exercise of OGR's investigatory power must be in furtherance of a valid legislative purpose. *See Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880) (neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen"); *Watkins*, 354 U.S. at 187 ("No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress.").

22. On March 3, 2026, Chairman Comer sent Mr. Black a letter requesting that Mr. Black appear for an in-person voluntary interview before the Committee. *See* Ex. A.

23. The letter identified a defined set of subjects that relate to the Epstein investigation, including:

> (i) the alleged mismanagement of the federal government's investigation into Mr. Jeffrey Epstein and Ms. Ghislaine Maxwell, (ii) the circumstances and subsequent investigations of Epstein's death, (iii) the operation of sex-trafficking rings and ways for the federal government to effectively combat them, (iv) ways in which Epstein and Maxwell sought to curry favor and exercise influence to protect their illegal activities, and (v) potential violations of ethics rules related to elected officials.

*Id*.

24. Between March and June 2026, Mr. Black's counsel repeatedly conferred with the Majority Staff to confirm the anticipated scope of the interview, including on March 24, April 8, April 28, and June 22, 2026. At an April 28, 2026 in-person meeting, counsel for Mr. Black informed the Majority Staff that Mr. Black viewed the interview as limited to the professional services Epstein had rendered to him and did not understand the interview to be an open-ended inquiry into his private life and the private lives of third parties. The Majority Staff responded that they intended to focus on information and documents in the public domain, including "Epstein Files" releases, materials the Committee obtained from the Epstein Estate, the Dechert Report, and news articles.

25. The Majority Staff did not identify NDAs, confidentiality agreements, or other non-public, private agreements as subjects for questioning. To the contrary, the Majority Staff represented that the Committee was not interested in a "fishing expedition" and that it was not "TMZ" or "People Magazine."

26. On a June 22, 2026 call, Mr. Black's counsel again advised the Majority Staff that Mr. Black would respectfully decline to answer questions relating solely to his personal life and the personal lives of third parties. The Majority Staff cautioned that such a limitation could be problematic if it prevented Mr. Black from answering questions about whether he had a relationship with a woman the Committee believed might be tied to Epstein. But the Majority Staff did not state that NDAs would be a subject of questioning, and did not state that there would be no limitations on scope. Mr. Black appeared for the voluntary interview based on that understanding.

**The Majority Staff Departed from OGR's Stated Scope**

27. In his opening statement to the Committee, Mr. Black categorically stated that he has never abused a woman, never been with an underage woman, never engaged in sex trafficking, never paid Epstein for access to women, and never was blackmailed by Epstein. *See* Ex. F, June 26, 2026 Testimony of Leon Black before H. Comm. on Oversight and Gov't Reform ("TI Tr."), at 12:15–18.

28. Following his opening statement, Mr. Black then turned to the subject he had understood to be the focus of the interview: his prior professional relationship with Epstein. For example, Mr. Black reaffirmed the conclusions that Dechert LLP reached after its exhaustive independent investigation (requested by Mr. Black) of his relationship with Epstein. *Id*. at 26:21–27:20. Dechert reported to the Apollo Board that Mr. Black paid Epstein $158 million for tax, estate-planning, and other legitimate activities; that all payments were reviewed by major law and accounting firms; that Epstein's work saved Mr. Black billions of dollars, and that Apollo never retained or conducted business with Epstein. *See* Ex. G, January 22, 2021 Investigative Report from Dechert LLP to Apollo Conflicts Committee ("Dechert Report"), at 3–4. Perhaps most

importantly, Dechert concluded, based on its review of the extensive record, that Mr. Black did not know of Epstein's criminal activities. *Id.* at 2.

29. At the OGR interview, Mr. Black said that he was prepared to explain in detail the payments he made to Epstein for professional services, but that he would decline to answer questions about the personal lives of adult women who have not themselves chosen to be connected to Epstein. *See* Ex. F, TI Tr. 17:22–18:3.

30. Less than one hour into the interview, the Majority Staff departed from the subjects identified in the March 3 Comer Letter and demanded that Mr. Black answer questions concerning NDAs. *Id*. at 39:10. Mr. Black attempted to cooperate to the extent permissible based on his confidentiality obligations and consistent with the legislative purpose of the inquiry. He addressed the circumstances involving three women who had sued him publicly: he answered questions about a confidentiality agreement involving Ms. Ganieva, who never knew Epstein and whose lawsuit was dismissed; acknowledged the existence of a confidentiality agreement with respect to a second woman, whom he stated he had never met and whose case was dismissed with prejudice; and stated that there was no confidentiality agreement in the case of the third woman, who has been sanctioned, along with her law firm, for lying to the federal court and submitting fabricated evidence.

31. The Majority Staff then broadened its questioning beyond those matters and beyond any reasonable interpretation of the Committee's legitimate purpose. Specifically, Staff asked Mr. Black, "[h]ow many NDAs are you a party to?" *id*. at 45:7; "who [in Mr. Black's social circle] has NDAs that you're aware of?" *id*. at 46:2–3; and "[a]re NDAs very common occurrences among your social circles?" *id*. at 45:2. These questions exceed any reasonable bounds of the Committee's authority to ask of a private citizen.

32. Moreover, none of these topics had been identified in Chairman Comer's March 3 letter or in the Majority Staff's pre-interview discussions with counsel. Mr. Black's counsel objected to that line of questioning as exceeding the scope OGR had identified and seeking private information outside the scope of OGR's authority.

33. The questions also implicated substantial third-party privacy interests. The questions, if answered, would have required Mr. Black to identify counterparties to private agreements, to the extent any such agreements exist, and to disclose information concerning the private circumstances of individuals who were not before the Committee, had not received notice from the Committee, had not consented to disclosure, and had no opportunity to protect their own privacy. Counsel for certain of these individuals have since informed representatives of Mr. Black that their clients do not release Mr. Black from any confidentiality provisions, do not want their identities or private lives exposed, and do not trust the Committee will keep their identities confidential given the numerous inadvertent releases by the government of identifying information that have already occurred in the Epstein matter.

**Chairman Comer Subpoenaed Mr. Black After Demanding Answers To Questions Outside OGR's Stated Scope**

34. Mr. Black's reasonable objections were dismissed by the Committee in short order when Chairman Comer, through his staff, served Mr. Black with two subpoenas: the Document Subpoena and the Deposition Subpoena.

35. The Document Subpoena demanded three categories of materials: (i) all NDAs to which Mr. Black is or was a party; (ii) all NDAs to which Epstein or Maxwell is or was a party; and (iii) all NDAs in which Epstein or Maxwell was referenced or was involved in the preparation, execution, or enforcement of the agreement. *See* Ex. B, Document Subpoena at 4. OGR's cover letter asserted that NDAs were "directly relevant to understanding the operation of sex-trafficking

rings, potential impediments to the federal government's investigations of sex-trafficking rings, and potential methods for Mr. Epstein and Ms. Maxwell to exercise influence over associates to protect their illegal activities." *Id*. at 2.

36. The Deposition Subpoena commanded Mr. Black to appear for compelled testimony before OGR on July 16, 2026—later extended to September 3, 2026—at 10:00 a.m. ET in Room 2154 of the Rayburn House Office Building. *See* Ex. C, Deposition Subpoena at 2. OGR's cover letter articulated the same purpose as the Document Subpoena, including that the Committee had "questions regarding [Mr. Black's] personal relationships with associates of Mr. Epstein and Ms. Maxwell, the use of non-disclosure and other confidentiality agreements by individuals associated with Mr. Epstein and Ms. Maxwell, efforts to exercise influence over associates to protect their illegal activities, and [Mr. Black's] knowledge of Mr. Epstein and Ms. Maxwell's illegal activities." *Id*.

37. The subpoenas and their cover letters appear to have been prepared, or at least contemplated, before the interview began, notwithstanding that NDAs had not previously been raised in any pre-interview discussions between Mr. Black's counsel and the Majority Staff.

38. After Chairman Comer served the subpoenas, Mr. Black ended his voluntary participation in the interview and left the proceeding. Before departing, Mr. Black's counsel stated on the record that Mr. Black had come to the Committee "voluntarily to assist" its work, but that Mr. Black's good faith had been "met with premeditated political misdirection by the committee which served Mr. Black with subpoenas in an unprecedented manner after less than an hour of questioning and before they even asked a single question about his payments to Epstein." *See* Ex. F, TI Tr. 47:3–7. Counsel described what had occurred as "nothing more than a planned political stunt," *id*. at 47:7–8, and reiterated on the record that Mr. Black had "never abused a woman,"

"never was with an underage woman," "never engaged in sex trafficking," "never paid Epstein for access to women," "was never blackmailed by Epstein," and had "no knowledge of any of Epstein's heinous conduct," *id*. at 47:11–14.

**Mr. Black Complied With the Document Subpoena Consistent With Any Legitimate Legislative Purpose**

39. Mr. Black attempted to avoid unnecessary litigation and consumption of judicial resources by engaging with OGR concerning the scope of both subpoenas. Through counsel, Mr. Black explained that he was willing to discuss a reasonable limitation of the subpoenas to the documents within the Committee's legitimate legislative purpose.

40. Although OGR granted brief extensions of the compliance deadlines while these discussions continued, those extensions did not resolve the parties' substantive dispute over the scope of the subpoenas.

41. On July 24, 2026, through counsel, Mr. Black submitted a written response to the Document Subpoena. *See* Ex. D, July 24 Black Letter. The submission explained that Mr. Black had appeared voluntarily and in good faith for the June 26 transcribed interview, fully intending to assist the Committee's work by providing information about his prior professional relationship with Epstein, including the basis for the payments he made to Epstein between 2013 and 2017. *Id*. at 1. The submission further explained that Majority Staff did not ask a single question about those payments before the interview was derailed by questioning concerning NDAs—a topic that had not been identified during the parties' pre-interview discussions. *Id*.

42. The July 24 Letter corrected the record concerning the pre-interview discussions between Mr. Black's counsel and the Majority Staff, as described above.

43. Mr. Black responded consistent with the Committee's legitimate legislative authority. In response to Request 2, which sought all non-disclosure agreements to which Epstein

or Maxwell is or was a party, Mr. Black stated that he does not possess or maintain responsive records. *Id*. at 9.

44. In response to Request 3, to the extent it sought agreements in which Maxwell was involved in the preparation, execution, or enforcement of an agreement, Mr. Black stated that he does not possess or maintain responsive records. *Id*. With respect to Epstein, Mr. Black explained that Epstein did not play any role in the preparation, execution, or enforcement of any confidentiality agreements to which Mr. Black may be a party, but noted that Epstein played a consulting role in discussions with Mr. Black and his counsel concerning the demands made by Ms. Ganieva. *Id*. Mr. Black further explained that Epstein's limited involvement in those discussions was reflected in public Epstein File materials, and was thus already public knowledge. *Id*. Because the Ganieva settlement agreement was the only agreement that remotely fit the Committee's stated theory of relevance, Mr. Black produced it.

45. The July 24 submission explained why the remainder of the Document Subpoena exceeded the Committee's lawful authority and stated investigative purpose. As drafted, the Committee's demand for "all non-disclosure agreements to which Leon David Black is a party" was extraordinarily broad. That demand was not limited to agreements involving Mr. Epstein or Ms. Maxwell, but instead could be interpreted as encompassing a huge swath of agreements to which Mr. Black may be a party, including routine commercial agreements, business arrangements, settlement agreements, and other private contracts that have no connection to Mr. Epstein, Ms. Maxwell, or any legitimate legislative purpose. Indeed, the definition of "non-disclosure agreement" in the Document Subpoena states that, for purposes of subpoena compliance, such agreements include "any agreement, instrument, or other document containing any term, condition, provision, clause, or covenant that requires, imposes, or purports to impose

any obligation of confidentiality, non-disclosure, non-use, secrecy, or similar restriction in which two or more parties agree that certain information will remain confidential." *See* Ex. B, Document Subpoena at 9.

46. Faced with that open-ended demand, Mr. Black responded reasonably. The July 24 submission noted that Chairman Comer had publicly described the Committee's interest as whether Epstein was involved in NDAs, whether Epstein was involved in writing them, and whether Epstein was involved in awarding funds to women for agreeing to NDAs. *Id*. at 10. Mr. Black responded that Epstein was not his "NDA adviser," was not involved in writing any confidentiality agreements for Mr. Black, was not involved in awarding funds to anyone related to Mr. Black, and was not otherwise involved in preparing or negotiating any confidentiality agreements for Mr. Black. *Id*.

47. The July 24 submission sought to make clear that Mr. Black was not refusing to cooperate with OGR's investigation. He produced the agreement that plausibly related to the Committee's stated theory of relevance and confirmed that he had no responsive records as to the other Epstein and Maxwell specific categories. The submission explained that a broader reading of the subpoena would compromise not only Mr. Black's privacy, but also the privacy and confidentiality interests of third parties who had not consented to disclosure and whose counsel had objected to any public identification in connection with the Epstein matter. *See* Ex. D, July 24 Black Letter at 3.

48. On August 18, 2026, counsel for Mr. Black again met with the Majority Staff in an effort to resolve the dispute without judicial intervention. Mr. Black proposed a path forward that would have provided OGR with an additional responsive record (in the form of a private settlement of a public legal claim), while preserving his objections to demands for unrelated private

agreements and protecting the privacy interests of third parties who had not consented to disclosure.

49. OGR rejected that proposal. In a letter sent to counsel later in the day on August 18, OGR stated that it was the sole arbiter of what should be produced, without regard to the private parties whose confidentiality interests would be exposed. OGR also demanded "full compliance" with the Document Subpoena and characterized Mr. Black's continued refusal to produce additional private agreements or appear for a recorded deposition as "unacceptable." *See* Ex. E, August 18 Comer Letter at 9. OGR then made its threat explicit: if Mr. Black did not produce additional documents or sit for the September 3 deposition, the Committee would use "all tools at its disposal, including contempt." *Id*.

50. The August 18 Letter doubled down on the Committee's demand for all NDAs to which Mr. Black is a party, regardless of whether the agreement involves Mr. Epstein or Ms. Maxwell, or any subject within the Committee's stated investigation.

51. OGR has used the threat of contempt and enforcement not to obtain information tied to a valid legislative purpose, but to pressure Mr. Black to abandon lawful objections in pursuit of news headlines. That use of process is coercive. It forces Mr. Black to choose between disclosing private information unrelated to OGR's stated investigation and facing escalating governmental and reputational consequences, including federal court enforcement proceedings.

**<u>The Subpoenas Would Tattoo the Stain of the Epstein Scandal on Innocent Women</u>**

52. Mr. Black is not the only one whose privacy interests would be compromised by OGR's enforcement of these subpoenas. As noted, counsel for certain individuals have informed representatives of Mr. Black that those individuals do not want their identities or private information to be revealed in any way, shape, or form—notwithstanding the subpoena's demand

for unredacted agreements. Indeed, they insisted on engaging with counsel for Mr. Black if the subpoena is broadly interpreted to include such information, precisely because of the inadvertent release of identifying information in the Epstein matter.

53. Counsel for other individuals whose identity could be compromised have informed representatives of Mr. Black that those individuals: (i) do not release Mr. Black from any existing confidentiality provisions; (ii) do not want their identities revealed and their private lives subjected to the political turmoil created by the Committee's subpoenas; and (iii) do not support the Committee's issuance of subpoenas to Mr. Black, and do not trust that their clients' identities will remain confidential regardless of what measures the Committee proposes.

54. These interests are critically important and deserving of dignity and respect. They reflect the compelling public policy, repeatedly recognized by the Supreme Court, of encouraging private settlements, and the reality that confidentiality—which spares both sides the stigmas associated with public disclosure and litigation—is often the *sine qua non* of such agreements. When two private parties, working through counsel, reach a negotiated settlement that contains non-disclosure provisions, those parties each rightly hold expectations that the other will comply with those provisions and breaches may be subject to civil action.

55. Requiring production of such agreements not only harms the individuals involved, but also forecloses a critical route to resolving disputes without the stigma and humiliations that often accompany public scrutiny. These subpoenas in no way serve the interests of the victims of Epstein's wrongdoing. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) ("public policy wisely encourages settlements"); *see also Marek v. Chesny*, 473 U.S. 1, 10 (1985) (recognizing "a clear policy of favoring settlement of all lawsuits").

56. In addition to promoting judicial efficiency, these agreements also safeguard private information and encourage candid, good faith negotiations between parties. *See, e.g.*, *Mokhiber v. Davis*, 537 A.2d 1100, 1116 (D.C. 1988) (recognizing that "a prior settlement agreement is generally an important factor weighing against disclosure when continued secrecy was a significant condition of reaching settlement"); *Hasbrouck v. BankAmerica Hous. Servs.*, 187 F.R.D. 453, 458 (N.D.N.Y. 1999) ("[P]rotecting the confidentiality of the settlement agreement promotes the important public policy of encouraging settlements.").

57. These confidentiality agreements also enable parties to obtain forms of relief they might not otherwise be entitled to obtain through the judicial process, or that, at best, would take a considerable amount of time and money to obtain. Confidentiality agreements confer substantial benefits on parties, without the need to engage in costly, protracted litigation. *See Town of Newton v. Rumery*, 480 U.S. 386, 387, 398 (1987) (a party's decision to enter into a negotiated release may reflect "a highly rational judgment that the certain benefits . . . exceed the speculative benefits of prevailing in a civil action" and "[the individual] therefore was spared the public scrutiny and embarrassment she would have endured if she had had to testify[.]").

58. For many people, entering into confidential negotiations or agreements, without the onus of a court proceeding, is the only acceptable option. And for others, confidentiality clauses, which protect their families and their reputations, are the only reason to enter into an agreement—especially when a claim is difficult to prove, as so many are. Stigma attaches to both sides in such cases, making confidentiality of paramount importance. Confidentiality agreements are vital to the lives of the parties who enter such agreements. Discounting the validity and importance of confidentiality agreements, regardless of any individual's potential connection to Epstein, is unfair and unjust. To shred the confidentiality protections of private agreements negotiated without any

participation of Epstein and to undermine the incentives for parties to enter into confidential, non-disclosure settlements, cannot be the Committee's legitimate legislative purpose.

59. What is perhaps most troubling about this inquiry is the apparent misimpression of the Committee that NDAs were used by Mr. Black in furtherance of Epstein's nefarious activities. Nothing could be further from the truth. Epstein communicated with legal counsel for Mr. Black, and Mr. Black himself, as to the extortionate demands made by Ms. Ganieva. Epstein otherwise had no role in negotiating, advising, or funding confidentiality agreements involving Mr. Black. To the extent any more such confidentiality agreements exist, they would have been negotiated between respective legal counsel well after Epstein's death, and no legitimate reason exists to breach their confidentiality and undermine the reliability of confidential settlements.

**COUNT I**
**(Declaratory and Injunctive Relief)**
The Subpoenas Are *Ultra Vires* and Exceed the Committee's Authority

60. Mr. Black restates the foregoing paragraphs as though fully set forth herein.

61. A congressional committee possesses only the investigative authority that the House has delegated to it. The validity of a congressional subpoena depends on the authority delegated to the committee that issued it. Courts must determine "whether the committee was authorized to exact the information which the witness withheld." *United States v. Rumely*, 345 U.S. 41, 42–43 (1953).

62. OGR has invoked its general oversight jurisdiction under House Rule X as the source of authority for its Epstein-related investigation. That authority does not permit OGR to issue subpoenas untethered to a valid legislative purpose, and it does not authorize OGR to demand private, confidential materials unrelated to its federal oversight mandate.

63. A subpoena that exceeds the Committee's delegated authority or demands information unrelated to any identified legislative objective is invalid even if the broader investigation includes permissible topics. A House Committee may not bootstrap an otherwise legitimate investigation into authority to compel unrelated unauthorized information from a private citizen.

64. The Document Subpoena and Deposition Subpoena exceed OGR's delegated authority. OGR has not identified any legislation that would be advanced by compelling every NDA to which Mr. Black is or was a party, regardless of date, counterparty, subject matter, connection to Epstein or Maxwell, connection to federal law enforcement, connection to sex trafficking, connection to elected officials, or connection to any proposed legislative reform.

65. OGR's conduct confirms the mismatch between its professed investigatory objective and the information it seeks. OGR represented that it sought to obtain information concerning Epstein, Maxwell, and related legislative reforms. Yet, after Mr. Black voluntarily prepared to discuss those subjects, OGR asked Mr. Black questions about NDAs unrelated to Epstein and then issued the Document Subpoena, requesting every NDA to which Mr. Black is or was a party. OGR's actual demands, therefore, exceed the authority that OGR claims to be exercising.

66. Because OGR's delegated mission is limited, OGR has no delegated authority to compel every NDA to which Mr. Black is or was a party. *See Tobin v. United States*, 306 F.2d 270, 274–75 (D.C. Cir. 1962) ("when Congress authorizes a committee to conduct an investigation, the courts have adopted the policy of construing such resolutions of authority narrowly") (citations omitted). Agreements bearing no connection to Epstein, Maxwell,

or the Committee's federal-oversight mandate fall outside the authority the House conferred on OGR.

67. Mr. Black is entitled to a declaration that the Document Subpoena and Deposition Subpoena exceed OGR's delegated authority and are invalid and unenforceable, and to an injunction barring OGR from enforcing, threatening to enforce, or otherwise compelling compliance with either subpoena.

**COUNT II**
**(Declaratory Relief)**
The Subpoenas Lack a Valid Legislative Purpose

68. Mr. Black restates the foregoing paragraphs as though fully set forth herein.

69. The Document Subpoena and Deposition Subpoena are invalid and unenforceable because they are not tied to any valid legislative purpose within OGR's delegated authority.

70. Congress's authority to investigate is broad, but it is not unbounded. A congressional inquiry must be conducted in furtherance of a "valid legislative purpose." *See Wilkinson v. United States*, 365 U.S. 399, 408–09 (1961).

71. That limitation follows from the Constitution itself. "The powers of Congress . . . are dependent solely on the Constitution," and "no express power in that instrument" authorizes Congress to investigate individuals or issue compulsory process for its own sake. *Kilbourn v. Thompson*, 103 U.S. 168, 182–89 (1880).

72. A valid congressional subpoena must "adequately identif[y] its aims and explain[] why the [subject's] information will advance its consideration of the possible legislation," because otherwise it is "impossible to conclude that a subpoena is designed to advance a valid legislative purpose[.]" *Trump v. Mazars USA, LLP*, 591 U.S. 848, 870–71 n.22 (2020) (citing *Watkins*, 354 U.S. at 201, 205).

73. "Oversight" in the abstract is not enough. For more than a century, the Supreme Court has recognized that neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen." *Kilbourn*, 103 U.S. at 190. "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id.* at 187.

74. Because Congress must act in furtherance of a legitimate legislative purpose, it may not "issue a subpoena for the purpose of law enforcement because those powers are assigned under our Constitution to the Executive and the Judiciary." *Mazars*, 591 U.S. at 863 (internal quotations and citations omitted). Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to 'punish' those investigated" are "indefensible." *Watkins*, 354 U.S. at 187.

75. Those principles are especially important where, as here, a congressional committee seeks information from a private citizen about that citizen and other private citizens. A subpoena directed at a private citizen's confidential agreements and demanding deposition testimony must fulfill a legislative purpose and the committee's delegated mission. It may not be used to compel disclosure of private information merely because public exposure would be politically useful.

76. Furthermore, "*Eastland* allows plaintiffs to attempt to quash a congressional subpoena if it lacks any legitimate legislative purpose from the outset." *de la Torre v. Cassidy*, No. 25-5353, 2026 WL 2211205, at *7 (D.C. Cir. July 31, 2026) (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)).

77. OGR's delegated mission is not unlimited. OGR's investigation is directed to the federal government's handling of specific matters concerning Epstein and Maxwell, including federal investigative decisions, federal records, sex-trafficking enforcement, victim protection, potential ethics issues involving elected officials, and related legislative reforms.

78. The subpoenas to Mr. Black far exceed that scope. OGR demands every NDA to which Mr. Black is or was a party, without limitation by time period, subject matter, counterparty, connection to Epstein or Maxwell, connection to sex trafficking, connection to federal law enforcement, connection to elected officials, or connection to any identified legislative proposal. *See* Ex. B, Document Subpoena at 4.

79. OGR has never identified any legislation that would be informed by compelling production of every NDA to which Mr. Black is or was a party.

80. The public statements of Committee Members further demonstrate their intent to pressure, expose, and punish a named private citizen rather than gather information necessary to support legislation. Committee Members have repeatedly in the media portrayed Mr. Black's willingness to maintain lawful objections as evidence of wrongdoing, demanded that he provide "real answers," suggested that he will be "held accountable," and characterized private agreements as inherently suspicious.

81. The Deposition Subpoena is similarly flawed. OGR has maintained that Mr. Black must appear for compelled testimony and answer questions concerning private NDAs outside the stated scope of the Committee's investigation. *Id.* at 2. Compelled testimony about unrelated private agreements does not advance legislation concerning the federal government's handling of the Epstein and Maxwell matters.

**COUNT III**
**(Declaratory and Injunctive Relief)**
OGR's Threatened Federal-Court Enforcement of the Subpoenas Is *Ultra Vires* Because Congress Has Not Authorized House Committees To Bring Civil Enforcement Actions

82. Mr. Black restates the foregoing paragraphs as though fully set forth herein.

83. OGR has threatened that, if Mr. Black does not comply with the subpoenas as written, OGR will pursue "all tools at its disposal, including contempt."

84. OGR's threatened federal-court enforcement of the subpoenas is *ultra vires* because Congress has not authorized House committees to bring civil actions to enforce subpoenas against private citizens. OGR possesses only the authority conferred by the Constitution, federal law, and House rules. Congress has never authorized House committees to invoke federal judicial power to enforce committee subpoenas against private citizens. Any threatened effort to do so therefore exceeds the authority conferred upon OGR and is unlawful.

85. Congress has created specific mechanisms for enforcing congressional subpoenas. It authorized the Senate, through Senate Legal Counsel, to bring civil actions to enforce certain Senate subpoenas. *See* 28 U.S.C. § 1365; 2 U.S.C. § 288d(a). But Congress has not enacted any comparable statute authorizing House committees to bring civil enforcement actions.

86. Congress's decision to authorize some enforcement mechanisms while withholding others leaves no room for OGR's threat that Mr. Black must comply with its subpoenas or face civil enforcement in federal court. Congress knew how to authorize subpoena-enforcement lawsuits and did so for the Senate. Congress did not authorize House committees to sue in federal court to enforce subpoenas.

87. Article I does not supply the missing cause of action. Although Congress may issue subpoenas in aid of a valid legislative function, the Supreme Court has recognized that the "[a]uthority to exert the powers of [Congress] to compel production of evidence differs widely

from authority to invoke judicial power for that purpose." *Reed v. County Comm'rs of Del. Cty.*, 277 U.S. 376, 389 (1928).

88. In *Reed*, the Senate had authorized a special committee to issue subpoenas and to "do such other acts as may be necessary" in connection with its investigation. *Id.* at 386–87. The committee argued that this authorization permitted it to sue to enforce a subpoena. *Id.* at 386–89. The Supreme Court rejected that argument and held that the Senate's authorization did not "intend to authorize the committee" to sue. *Id.* at 389.

89. *Reed* confirms that the authority to issue a subpoena does not create the authority to invoke Article III to enforce it. A legislative committee's authority to issue compulsory process, therefore, does not create the power to enforce a subpoena in federal court.

90. That conclusion is reinforced by the D.C. Circuit's opinion in *Comm. on the Judiciary v. McGahn*, 973 F.3d 121 (D.C. Cir. 2020), *vacated*, No. 19-5331 (D.C. Cir. June 10, 2021). Although that opinion was vacated before *en banc* review, its reasoning remains highly persuasive. *See Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997) (opinion "remain[s] 'on the books' even if vacated, albeit without any preclusive effect," and "future courts [are] able to consult its reasoning").

91. In *McGahn*, the D.C. Circuit addressed whether the House Judiciary Committee had authority to enforce a subpoena in federal court. *McGahn*, 973 F.3d at 122–23. The court held that the answer is no. *Id.* at 123. As the court explained, Congress could enact a statute making House requests for information judicially enforceable, but Congress has not done so. *Id.* at 123–24. As a result, the House lacks the power to enforce subpoenas in federal court. *Id.*

92. Congress's own conduct confirms the absence of an existing enforcement mechanism. Following *McGahn*, legislation was introduced that would have expressly authorized

House subpoena-enforcement suits. *See* Congressional Subpoena Compliance and Enforcement Act, H.R. 8335, 116th Cong. § 3 (2020) (proposing to add 28 U.S.C. § 1365a to authorize judicial enforcement of congressional subpoenas); *see also* H.R. 6079, 117th Cong. (2021) (reintroducing same). That proposed legislation did not become law. Congress's attempt to create such authority for the House demonstrates that Congress understood no such authority already existed. OGR therefore seeks through litigation an authority that Congress never provided.

93. OGR's contrary position creates a concrete and immediate controversy. OGR maintains that Mr. Black must comply with the Document Subpoena and Deposition Subpoena and has threatened contempt, sanctions, litigation, and reputational consequences if he does not. Mr. Black maintains that OGR lacks any statutory, constitutional, equitable, implied, or declaratory-judgment cause of action to enforce the subpoenas against him.

94. Mr. Black is entitled to declaratory and injunctive relief barring OGR from enforcing, threatening to enforce, or otherwise compelling compliance with the Document Subpoena or Deposition Subpoena through a civil action that Congress has not authorized.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Black respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

a) Declaring that OGR lacks any statutory, constitutional, equitable, or implied cause of action to enforce the Document Subpoena or Deposition Subpoena against Mr. Black in federal court;

b) Declaring that the Document Subpoena and the Deposition Subpoena are invalid as *ultra vires* and unconstitutional, and therefore unenforceable;

c) Declaring that the Document Subpoena and Deposition Subpoena are null, invalid, and unenforceable because they exceed OGR's delegated authority and are not tethered to any valid legislative purpose;

d) Enjoining OGR and its members, agents, staff, counsel, and any person acting in concert with them from enforcing, threatening to enforce, or otherwise compelling compliance with the Document Subpoena or Deposition Subpoena in federal court; and

e) Granting such other and further relief as the Court deems just and proper.

Dated: September 3, 2026

Respectfully submitted,

*/s/ Peter S. Spivack*
Peter S. Spivack (D.C. Bar No. 453731)
David I. Sharfstein (D.C. Bar No. 1034400)
Aaron S. Cutler (D.C. Bar No. 1029062)
(*pro hac vice* forthcoming)
Adam J. Fridman (D.C. Bar No. 1031766)
(*pro hac vice* forthcoming)
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
peter.spivack@hlc.com
david.sharfstein@hlc.com
aaron.cutler@hlc.com
ari.fridman@hlc.com

Susan R. Estrich
(*pro hac vice* forthcoming)
Estrich Goldin LLP
699 W Exposition Boulevard
Los Angeles, CA 90089
Tel: (213) 399-2132
susan@estrichgoldin.com

*Counsel for Leon D. Black*