# Exhibit D

HOGAN LOVELLS
CADWALADER

Hogan Lovells Cadwalader US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

T: +1 202 637 5600
F: +1 202 637 5910
www.hlc.com

July 24, 2026

*Via electronic communication*

**Confidential Submission**

The Honorable James Comer
Chairman, U.S. House of Representatives
Committee on Oversight and Government Reform
2410 Rayburn House Office Building
Washington, DC, 20515-1701

**Re: Response to the June 26, 2026 Document Subpoena to Leon Black and Discussion of Related Legal Considerations**

Dear Chairman Comer:

On June 26, 2026, our client, Leon Black, sat voluntarily for a transcribed interview (the "June 26th TI") before the Committee on Oversight and Government Reform (the "Committee") of the U.S. House of Representatives. Mr. Black did so in good faith, fully intending to provide information that would be helpful to the Committee's work, including a detailed explanation for the basis upon which Mr. Black paid Jeffrey Epstein between the years 2013 and 2017.

The June 26th TI was abruptly halted as a result of unanticipated questioning by the Majority staff that focused on an inherently private topic: non-disclosure agreements ("NDAs"). During discussions that occurred over the span of several months preceding the June 26th TI, the issue of confidentiality agreements or NDAs had never been discussed between the parties as an area of focus for the Committee. Indeed, we were assured that the Majority's questioning of Mr. Black would focus on publicly available documents. Instead, Chairman Comer told the media before the interview had even begun that its focus would be, in part, NDAs and secret bank records.[1]

When the June 26th TI commenced, it became clear that NDAs would be the Majority's focus. The Majority did not ask a single question about payments to Epstein. Their questions

---

[1] *Rep. James Comer on Leon Black Testimony*, CSPAN (June 26, 2026) https://www.youtube.com/watch?v=Jf0dGFH4XRE.

about NDAs were not even limited to those where Epstein played any role. When we raised the obvious concerns with disclosing any non-disclosure agreements that may exist, Chairman Comer issued Mr. Black two subpoenas. The first is a document subpoena (the "June 26th Document Subpoena") with an initial response date of July 10, 2026, later extended to July 24, 2026, to which this submission responds. The second is a subpoena for a deposition (the "June 26th Deposition Subpoena") with an initial appearance date of July 16, 2026, later extended to September 3, 2026.

NDAs are a routine and prudent measure in business, and they cover a range of activity (*e.g.*, trade secrets, business ventures, employment discussions, etc.) where one person promises not to disclose confidential information shared by the holder of that information. Mr. Black has signed many NDAs in his career. Notwithstanding its literal request for all "NDAs" to which Mr. Black is a party, the Committee plainly does not mean to be asking for all of them. Its interest, as stated publicly by Chairman Comer on June 26, 2026, is whether "Jeffrey Epstein [was] involved in the NDAs, was he involved in writing, [and] was he involved in awarding funds to the women for the NDAs."[2] As Chairman Comer explained in the cover letter to the June 26th Document Subpoena, NDAs are:

> [D]irectly relevant to understanding the operation of sex-trafficking rings, potential impediments to the federal government's investigations of sex-trafficking rings, and potential methods for Mr. Epstein and Ms. Maxwell to exercise influence over associates to protect their illegal activities.[3]

Mr. Black is today producing the only confidentiality agreement that remotely meets this definition of relevance. It is the only such agreement entered into during Epstein's lifetime, the only one in which he was arguably "involved," and the only one within the scope of the Committee's goals to identify "potential methods for Mr. Epstein and Ms. Maxwell to exercise influence over associates to protect their illegal activities."

Mr. Black is not the only one whose interests would be compromised by any broader interpretation of the subpoena. Counsel for certain individuals have informed representatives of Mr. Black that those individuals do not want their identities and private information to be revealed in any way, shape or form. Indeed, they insist on engaging with counsel for Mr. Black if the subpoena is broadly interpreted to include such information, precisely because of the inadvertent releases of identifying information in the Epstein matter. Counsel for other individuals whose identity could be compromised have informed representatives of Mr. Black that those individuals:

---

[2] *Rep. James Comer Subpoenas Leon Black*, C-SPAN (June 26, 2026), https://www.youtube.com/watch?v=WaEIPDCI9ZM.

[3] Cover letter to document subpoena, dated June 26, 2026.

1) do not release Mr. Black from any existing confidentiality provisions that would be contained in confidential non-public settlement agreements;

2) have no interest in having their identities revealed and their private lives subjected to the political turmoil created by the Committee's subpoenas; and

3) do not support the Committee's issuance of subpoenas to Mr. Black, and do not trust that their clients' identities will remain confidential.[4]

These interests are critically important and deserving of respect. They reflect the public policy, repeatedly recognized by the Supreme Court, of encouraging private settlements, and the reality that confidentiality—which spares both sides the stigmas associated with public disclosure and litigation—is often the *sine qua non* of such agreements. When two private parties, working through counsel, reach a negotiated settlement that contains non-disclosure provisions, those parties each rightly hold expectations that the other will comply with those provisions and breaches may be subject to civil action.

Protecting the confidentiality of settlement agreements not only protects Mr. Black's privacy, but also the privacy of others who may be involved. These individuals want no association with Epstein, and should not be forever branded as such by this Committee's public disclosure of their names and agreements. Requiring production of such agreements not only harms the individuals involved but also forecloses a critical route to resolving disputes without the stigma and humiliations that often accompany public scrutiny. These subpoenas in no way serve the interests of the victims of Epstein's wrongdoing.

What is perhaps most troubling about this inquiry is the apparent misimpression of the Committee that NDAs were used by Mr. Black in furtherance of Epstein's nefarious activities. Nothing could be further from the truth. Epstein communicated with legal counsel for Mr. Black, and Mr. Black himself, as to the extortionate demands made by Ms. Ganieva. Epstein otherwise had no role in negotiating, advising, or funding confidentiality agreements. To the extent any more such confidentiality agreements exist, they would have been negotiated between respective legal counsel well after Epstein's death, and no reason exists to breach their confidentiality. The same is true of confidentiality agreements with women who had no known connection to Epstein, or confidentiality agreements with women whom Mr. Black never met. With the elimination of those categories, what is left is the Ganieva settlement agreement.

---

[4] Congress's authority to investigate is broad, but it is not unbounded. A congressional inquiry must be conducted in furtherance of a "valid legislative purpose." *See Wilkinson v. United States*, 365 U.S. 399, 408–09 (1961); *see also Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880) (explaining that neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen").

Before addressing at greater length the substance of today's production, this submission is summarized as follows. **Section I** outlines the negotiations between counsel and Majority staff preceding the June 26th TI, demonstrating that Mr. Black sought in good faith to assist the Committee in its important work. **Section II** summarizes the TI itself and makes clear that Mr. Black sought to answer the questions posed consistent with his legal obligations to maintain confidentiality. Finally, **Section III** addresses today's submission.

* * * * *

## I. Correcting the Record on the Negotiations Regarding the Transcribed Interview

At the conclusion of the June 26th TI, Majority staff stated that Mr. Black's counsel first informed the Majority staff on June 22, 2026 of Mr. Black's unwillingness to discuss his personal conduct (the "June 22nd call"), which was just days before the interview. Respectfully, this statement is not accurate: on an April 8, 2026 video call with the Majority staff, Mr. Black's counsel expressed an interest in engaging in a dialogue regarding the scope of Mr. Black's TI. Within weeks, counsel specified their concerns. At an in-person meeting on April 28, 2026 ("April 28th meeting"), counsel informed the Majority staff that Mr. Black viewed the scope of the TI as limited to the professional services rendered by Epstein to Mr. Black, thus excluding any details of Mr. Black's private life as outside the legitimate scope of the Committee's investigation.

Also, during the April 28th meeting, Mr. Black's counsel understood the Majority staff to explain that they intended to focus the interview on information and documents in the public domain. As stated by the Majority staff, this would include documents that were released in the "Epstein Files" pursuant to the Epstein Files Transparency Act (H.R. 4405), as well as documents released by the Committee that were obtained from the Epstein Estate, the Dechert Report, and news articles.

During the June 22nd call, counsel expressly informed the Majority staff that Mr. Black would respectfully decline to answer questions that related solely to his personal life. The Majority staff represented that this would be problematic insofar as it would seem to exclude responding to questions regarding whether Mr. Black had a sexual relationship with a woman that the Committee believed might be tied to Epstein. The Majority staff said that a blanket refusal at the TI to answer questions about personal conduct with a woman that the Committee believes may be tied to Epstein could potentially result in Mr. Black having to answer the same questions within a "few months." For the record, Mr. Black was not asked such a specific question.

The Majority staff did note that answering "as much as possible" would be the best way for Mr. Black to avoid a reappearance. However, the Majority staff never stated on the June 22nd Call, contrary to what it represented on the record at the TI, that "there would be no limitations on scope" for the TI—and it certainly did not insist that Mr. Black would have to discuss any potential

confidentiality agreements in this setting.[5] In fact, the core breakdown in dialogue that led to the premature termination of the June 26th TI is that the Majority staff never indicated to Mr. Black's counsel that confidential and legally binding agreements would be a subject covered in the interview.

The Majority staff did not ask any questions during the June 26th TI about payments Mr. Black made to Epstein. Mr. Black understood the Committee's interest in the payments and was prepared to discuss this topic at length, which counsel had previewed for the Majority staff on the June 22nd Call. As described above, at the April 28th meeting, counsel understood the Majority staff to say that its focus would be on publicly available documents. NDAs, by contrast, are confidential and private documents. The Majority's conduct during the interview as to NDAs, which the Majority staff should have known Mr. Black was not at liberty to discuss, seemed designed to put Mr. Black in a position that would trigger the service of the subpoenas and prevent Mr. Black from providing important context around his dealings with Epstein.

In summary, the premature conclusion to the June 26th TI had nothing to do with Mr. Black's unwillingness to cooperate and answer important questions during the interview, and everything to do with the Committee's changed approach to the June 26th TI.

## II. <u>Summary of the June 26th TI</u>

Mr. Black sat voluntarily for the June 26th TI in Room 2154 of the Rayburn House Office Building. Moments before the TI began, Chairman Comer stated outside of the room to reporters that the Majority intended to focus on NDAs and bank violations.[6] Mr. Black was not informed of these areas of focus, even as the interview began. Notably, neither topic had been identified to Mr. Black's counsel during the multiple pre-interview discussions with the Majority staff regarding the anticipated scope of questioning. Chairman Comer's emphasis on NDAs and bank violations—which we assume to mean Suspicious Activity Reports ("SARs")—was directly at odds with representations made by the Majority staff at the April 28th in-person meeting with counsel, in which the Majority staff indicated that the Committee intended to focus on information and documents in the public domain.

As Mr. Black explained in his opening statement, Epstein performed highly valuable and legitimate tax and estate planning services for Mr. Black, for Mr. Black's family, and for Mr. Black's family office. Mr. Black's testimony was fully supported by the conclusions of a highly reputable, independent law firm, Dechert LLP, which conducted an exhaustive investigation of his

---

[5] The Majority staff stated it was not interested in a "fishing expedition" and that it was not "TMZ" or "People Magazine" (*i.e.*, tabloid publications that seek to profit from sensationalism, invasions of privacy, and public embarrassment).

[6] *Rep. James Comer on Leon Black Testimony*, CSPAN (June 26, 2026) https://www.youtube.com/watch?v=Jf0dGFH4XRE.

ties to Epstein without any restrictions, including an examination of more than 60,000 documents and interviews of more than 20 individuals.[7] Mr. Black is the only person associated in any way with Epstein to have authorized such an investigation.[8]

The Dechert report concluded that Mr. Black had paid Epstein $158 million for tax, estate planning and other legitimate activities, that all of the payments to him were reviewed by major law and accounting firms, and that the payments saved Mr. Black billions of dollars and thus amounted to an after-tax commission of 5%. Most important, the Dechert report found that Mr. Black had no awareness of, and no involvement in, any of Epstein's criminal activities. Moreover, it is a matter of public record that plaintiffs' attorneys approached both the Manhattan District Attorney's Office and the U.S. Attorney's Office for the Southern District of New York (during the Biden Administration) in an effort to persuade them to bring charges against Mr. Black. Both of these reputable law enforcement offices declined to do so.

In his opening statement, Mr. Black also categorically stated that he has never abused a woman, never been with an underage woman, never engaged in sex trafficking, never paid Epstein for access to women, and was never blackmailed by Epstein.[9] Mr. Black said he was eager to explain to the Committee why he paid Epstein the money he did; he also indicated that he would decline to answer questions about personal matters that would be hurtful to him and his family, or about the personal lives of adult women who have not themselves chosen to be, and do not deserve to be, connected to Epstein.[10]

Towards the end of its first hour-long round of questioning, the Majority staff asked Mr. Black whether he had an NDA with a woman named Guzel Ganieva.[11] Mr. Black deferred to counsel to address this question.[12] Counsel informed the Committee that, without confirming or

---

[7] *Apollo Global Management Form 8-K, Exs. 99.1 and 99.2,* United States Securities and Exchange Commission (citing to Dechert LLP report summarizing independent investigation findings regarding Mr. Black's professional relationship with Epstein), available at https://www.sec.gov/Archives/edgar/data/1411494/000119312521016405/d118102dex991.htm.

[8] On July 21, 2026, just days ago, the Gates Foundation released an executive summary of a review conducted by an outside law firm, but the law firm that handled the Gates Foundation review did not receive access to personal communications nor did it have access to interactions with Epstein in a personal capacity or through separate legal entities. *See https://www.gatesfoundation.org/ideas/media-center/press-releases/2026/07/external-review*.

[9] *Official transcript of transcribed interview of Leon Black*, U.S. House Committee on Oversight and Government Reform (June 26, 2026) at 12 (lines 15–18).

[10] *Id.* at 17 (line 25), and 18 (lines 1–3).

[11] *Official transcript of transcribed interview of Leon Black*, at 39 (line 10).

[12] *Id.* at 39 (line 11).

denying the existence of any confidentiality agreement, Mr. Black would be prohibited from discussing the contents of any such agreement or even acknowledging its existence.[13]

The Majority staff persisted with its questioning regarding NDAs and counsel requested the opportunity to consult with Mr. Black off the record.[14] Following the off-the-record consultation between Mr. Black and his legal team, Mr. Black advised the Committee that, in an effort to cooperate with the Committee, he was willing to address the circumstances involving three women who sued him. Mr. Black subsequently (1) answered questions about a confidentiality agreement involving Ms. Ganieva[15]; (2) acknowledged the existence of a confidentiality agreement with respect to a second woman, Cheri Pierson, whom he stated that he never met[16]; and (3) stated that there is no confidentiality agreement in the case of the third woman.[17]

The Majority staff then began asking questions that fell outside what Mr. Black's counsel understood to be a reasonable interpretation of the Committee's stated legislative purpose. The Majority staff asked Mr. Black "[h]ow many NDAs are you a party to,"[18] without any link to the Committee's articulation of the purposes of its investigation into Epstein's conduct. The Majority staff also did not limit its questions to Mr. Black himself, asking "who [in Mr. Black's social circle] has NDAs that you are aware of,"[19] and on another occasion asking "[a]re NDAs very common occurrences among your social circles?"[20]

---

[13] *Id.* at 39 (lines 12–14), and 40 (lines 5–9).

[14] *Id.* at 40 (lines 5–9).

[15] *Id.* at 41 (lines 8–24).

[16] *Id.* at 43 (lines 3–5).

[17] *Id.* at 42 (lines 18–24). The first two lawsuits were dismissed with prejudice. The third has resulted in sanctions against the plaintiff, her lawyer, and the law firm of record for a range of unethical and fraudulent conduct.

[18] *Id.* at 45 (line 7).

[19] *Id.* at 46 (lines 2–3).

[20] *Id.* at 45 (line 2). To be clear, the Majority staff ostensibly asked these questions of Mr. Black as a result of a statement Mr. Black made in a media publication, which the Majority staff cited as an article published in 2024 in *Puck* titled "Leon Black from the Ashes." *Id.* at 45 (line 1). However, merely because Mr. Black made such a statement to a media publication does not, in any way, convert that statement into the official business of a transcribed interview of a private citizen being conducted by a committee of the U.S. House of Representatives. There was not then, and is still not today, any legitimate legislative purpose for such "fishing expedition" questions, and even more so in the context of a committee investigation that is specifically constituted to examine the nefarious activities of Epstein.

The Majority staff then stated its understanding that Mr. Black was refusing to discuss any other NDAs on the basis that was set forth by Mr. Black's counsel. At that point, the Majority staff served two subpoenas on Mr. Black.[21] Concurrently, Chairman James Comer left the room and informed the media of the Committee's decision to issue the subpoenas.[22] The Minority did not receive an opportunity to ask questions before the Majority served the subpoenas.

Meanwhile, counsel requested an opportunity to consult with Mr. Black off-the-record. Following that consultation, counsel read a brief statement into the record.[23] The statement criticized the Committee's decision to issue subpoenas as "premeditated political misdirection" less than an hour into the Majority's first round of questioning; noted that the Majority had not asked a single question about Mr. Black's legitimate payments to Epstein for professional services; without confirming or denying the existence of any NDA, denied that Epstein had any involvement with any non-public NDA to which Mr. Black may be a party; and insisted that Mr. Black has never abused a woman, never was with an underage woman, never engaged in sex trafficking, never paid Epstein for access to women, never was blackmailed by Epstein, and had no knowledge of Epstein's heinous conduct.[24]

Mr. Black and his legal team then departed the interview because the surprise service of these subpoenas undermined Mr. Black's legitimate expectations about how a voluntary transcribed interview should proceed. As the legal team departed, the Majority staff continued speaking on the record.[25] The Majority staff asserted that, on the June 22nd Call, Mr. Black's legal team advised them, for the first time, that Mr. Black viewed his personal conduct as outside the scope of the voluntary TI.[26] The Majority staff also asserted that it "indicated" on the June 22nd Call that "there would be no limitations on scope" for the TI.[27] Finally, the Majority staff asserted that it had "consistently indicated to Mr. Black's counsel that there would be no time or scope

---

[21] *Id.* at 46 (lines 10–16). It appeared to Mr. Black's counsel that the subpoenas and cover letters were prepared prior to the June 26th TI itself, even though the issue of NDAs had not been previously raised as a topic of substantial interest.

[22] *Rep. James Comer Subpoenas Leon Black*, C-SPAN (June 26, 2026), https://www.youtube.com/watch?v=WaEIPDCI9ZM.

[23] In parallel, Susan Estrich of Mr. Black's legal team issued a substantially similar statement to the media assembled in the hallway.

[24] *Official transcript of transcribed interview of Leon Black*, at 46 (line 25), and 47 (1–15).

[25] *Id.* at 47 (lines 16–25), and 48 (1–15).

[26] *Id.* at 47 (lines 20–21).

[27] *Id.* at 47 (lines 22–23).

limitations" on the interview.[28] As outlined above, Mr. Black's counsel believes this version of events is inaccurate.

### III. <u>Mr. Black's Responses to the June 26th Document Subpoena</u>

The June 26th Document Subpoena contains three categories of records sought by the Committee. Mr. Black responds to each category as follows.

In response to Request 2, which seeks "*[a]ll non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell is or was a party,*"[29] Mr. Black respectfully submits that he does not possess or maintain any records responsive to this request.

In response to Request 3, which seeks, in part, "*[a]ll non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell . . . were involved in the preparation, execution, or enforcement thereof,*"[30] Mr. Black respectfully submits that he does not possess or maintain any records responsive to this request as it pertains to Maxwell. Concerning Epstein, Mr. Black is producing a copy of the confidentiality agreement with Ms. Ganieva. *See* OGR-LDB00000001.

Epstein did not play a role with respect to the preparation, execution, or enforcement of any confidentiality agreements to which Mr. Black may be a party—except arguably Epstein's consulting role in discussions with legal counsel for Mr. Black, and Mr. Black himself, as to the extortionate demands made by Ms. Ganieva. Mr. Black acknowledged in the June 26th TI that he and Ms. Ganieva "had an on and off consensual adult affair . . . for six years."[31] Mr. Black further informed the Committee that, after Ms. Ganieva spent time abroad, "she came back, and all of a sudden claimed that [Mr. Black] had ruined her life . . . and that she had to have $100 million paid to her."[32] Mr. Black viewed this as an attempt by Ms. Ganieva to extort Mr. Black in order to avoid public embarrassment. As Mr. Black described, he and Ms. Ganieva met several times over the summer of 2015 to "work[] out a settlement agreement which resulted in an NDA."[33]

Epstein's limited involvement in consulting with Mr. Black about Ms. Ganieva's extortionate conduct can be found in public documents contained in the Epstein Files.[34] During

---

[28] *Id.* at 47 (lines 23–24).

[29] *June 26th Document Subpoena*.

[30] *Id.*

[31] *Official transcript of transcribed interview of Leon Black*, at 41 (lines 13–14).

[32] *Id.* at 41 (lines 16–17).

[33] *Id.* at 41 (lines 19–20).

[34] *See* EFTA00590667, EFTA02493136, EFTA02488634, EFTA02488158, EFTA00845602, EFTA02484412, EFTA02484705, EFTA02367417, EFTA00814162, EFTA02667813, EFTA02365263, EFTA02659977, EFTA02665413, EFTA02618356, and EFTA02627089.

the June 26th TI, Mr. Black confirmed certain terms of Ms. Ganieva's agreement regarding payment, loan forgiveness, and visa assistance.[35] Mr. Black also described Epstein's role in the events preceding the settlement agreement.[36] Epstein is not a party to Ms. Ganieva's agreement.

Request 1 seeks "*[a]ll non-disclosure documents to which Leon David Black is a party*," and Request 3, seeks, in part, "*[a]ll non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell are referenced . . .*"[37] Respectfully, these requests call for information beyond the scope of this Committee's investigation, as Chairman Comer himself defined it in his statement to the media outside the interview room on June 26, 2026 and in the cover letter to the June 26th Document Subpoena. At that time, he said the Committee was investigating whether "Jeffrey Epstein [was] involved in the NDAs, was he involved in writing, [and] was he involved in awarding funds to the women for the NDAs."[38]

In response to Chairman Comer's questions, Mr. Black states that, as discussed in the June 26th TI, Epstein "was not [Mr. Black's] NDA adviser."[39] Epstein was not involved in "writing" any confidentiality agreements, he was not involved in "awarding funds to anyone," and he was not otherwise involved in preparing or negotiating any confidentiality agreements. The answers to Chairman Comer's questions to the media are "no."

To go beyond these questions threatens not only the privacy of Mr. Black and his family, but also that of any person who decided to enter into a confidentiality agreement with Mr. Black or anyone else. There is, as a general matter, great value to encouraging settlement of claims that might otherwise overwhelm the judicial system; that benefit has been recognized by the United States Supreme Court. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) ("public policy wisely encourages settlements"); *see also Marek v. Chesny*, 473 U.S. 1, 10 (1985) (recognizing "a clear policy of favoring settlement of all lawsuits").

In addition to promoting judicial efficiency, these agreements also safeguard private information and encourage candid, good faith negotiations between parties. *See Mokhiber v. Davis*, 537 A.2d 1100, 1116 (D.C. 1988) (recognizing that "a prior settlement agreement is generally an important factor weighing against disclosure when continued secrecy was a significant condition of reaching settlements"); *Hasbrouck v. BankAmerica Hous. Servs.*, 187 F.R.D. 453, 458 (N.D.N.Y. 1999) ("[P]rotecting the confidentiality of the settlement agreement promotes the important public policy of encouraging settlement."); *In re Franklin Nat'l Bank*

---

[35] *Id.* at 41 (lines 21–23).

[36] *Id.* at 41 (lines 9–13).

[37] *June 26th Document Subpoena*.

[38] *Rep. James Comer Subpoenas Leon Black*, C-SPAN (June 26, 2026), https://www.youtube.com/watch?v=WaEIPDCI9ZM.

[39] *Official transcript of transcribed interview of Leon Black*, at 42 (lines 16–17).

*Securities Litigation*, 92 F.R.D. 468, 472 (E.D.N.Y. 1981) (stating that a settlement agreement with a confidentiality clause can "induce[] substantial changes of position by many parties in reliance on the condition of secrecy" and that later attempts to make such agreements public can "work an injustice on these litigants and make future settlements predicated upon confidentiality less likely").

These confidentiality agreements also enable parties to obtain forms of relief they might not otherwise be entitled to obtain through the judicial process, or that, at best, would take a considerable amount of time and money to obtain. Confidentiality agreements confer substantial benefits on parties, without the need to engage in costly, protracted litigation. *See Town of Newton v. Rumery*, 480 U.S. 386, 387, 398 (1987) (a party's decision to enter into a negotiated release may reflect "a highly rational judgment that the certain benefits . . . exceed the speculative benefits of prevailing in a civil action" and "[the individual] therefore was spared the public scrutiny and embarrassment she would have endured if she had had to testify[.]").

For many people, entering into confidential negotiations or agreements, without the onus of a court proceeding, is the only acceptable option. And for others, confidentiality agreements, which protect their families and their reputations, are the only reason to enter into an agreement—especially when a claim is hard to prove, as so many are. Stigma attaches to both sides in such cases, making confidentiality of paramount importance. Confidentiality agreements are vital to victims' lives. Discounting the validity and importance of confidentiality agreements, despite any individual's potential connection to Epstein, is unfair and unjust. To shred the confidentiality protections of agreements negotiated without any participation of Epstein and to undermine the incentives for parties to enter into settlements, cannot be what this Committee seeks to do.

* * * * *

This submission responds to the June 26, 2026 document subpoena issued by Chairman Comer. The submission of this information does not waive, nor is it intended to waive, any rights, privileges, objections to scope or enforceability, or immunities of Mr. Black with respect to this matter, including any applicable attorney-client, work product, or other privilege or immunity. To the extent that any non-responsive information has inadvertently been disclosed, Mr. Black does not agree to any expansion in scope of the June 26, 2026 Document Subpoena. Mr. Black expressly reserves any applicable rights, privileges, and immunities to which he is entitled under applicable law.

Sincerely,

Aaron Cutler

Peter Spivack
David Sharfstein
Adam J. Fridman

Counsel for Mr. Black
Hogan Lovells Cadwalader US LLP

Susan Estrich
Anya Goldin

Counsel for Mr. Black
Estrich Goldin LLP

cc: The Honorable Robert Garcia, Ranking Member
Committee on Oversight and Government Reform