# Exhibit E

JAMES COMER, KENTUCKY
CHAIRMAN

ONE HUNDRED NINETEENTH CONGRESS

ROBERT GARCIA, CALIFORNIA
RANKING MEMBER

Congress of the United States

House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5074
MINORITY (202) 225–5051

https://oversight.house.gov

August 18, 2026

Aaron Cutler, et al.
Hogan Lovells Cadwalader US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

Dear Mr. Cutler:

The Committee on Oversight and Government Reform (Committee) has received your July 24, 2026 letter outlining arguments for why your client, Leon Black, should not be required to fully comply with the subpoena issued to him on June 26, 2026, for non-disclosure agreements in his possession, custody, or control.[1] In response to this subpoena, your client produced a single non-disclosure agreement while claiming it is "the only one within the scope of the Committee's goals."[2] The Committee rejects your assertion and reiterates that full compliance with the subpoena issued to your client requires the production of "*all* non-disclosure agreements to which [he] is a party."[3]

On March 3, the Committee sent a letter to Mr. Black to request his appearance at a voluntary transcribed interview before the Committee.[4] To accommodate Mr. Black's schedule, the Committee scheduled this transcribed interview for June 26. On April 16, you confirmed by email that your client would appear before the Committee on this scheduled date.[5] The Committee's letter and request for Mr. Black to testify was based on public reporting, documents released by the Department of Justice, and documents obtained by the Committee showing Mr. Black had information that will assist the Committee's investigation.

## I. Scope of Transcribed Interview Was Clear and Never Subject to Limitation

Your insistence that the Committee exceeded the stated scope of the transcribed interview of Mr. Black on June 26 is unfounded and without merit. The Committee's March 3 letter clearly articulated its investigative scope and intent, including (i) the alleged mismanagement of the federal government's investigation into Mr. Jeffrey Epstein and Ms. Ghislaine Maxwell, (ii) the circumstances and subsequent investigations of Mr. Epstein's death, (iii) the operation of sex-

[1] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[2] *Id*.
[3] Subpoena to Leon David Black (June 26, 2026) (Emphasis added).
[4] Letter from James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (Mar. 3, 2026).
[5] Email from Aaron Cutler to Daniel Ashworth, et al., Gen. Counsel, H. Comm. on Oversight and Gov't Reform (Apr. 16, 2026, at 2:13PM).

trafficking rings and ways for the federal government to effectively combat them, (iv) ways in which Mr. Epstein and Ms. Maxwell sought to curry favor and exercise influence to protect their illegal activities, and (v) potential violations of ethics rules related to elected officials. [6] The questions posed to Mr. Black and the subpoenaed documents at issue fall well within this scope.

Your July 24 letter claims that during an April 8 meeting with Committee, "Mr. Black's counsel expressed an interest in engaging in a dialogue regarding the scope of Mr. Black's [transcribed interview]."[7] However, no such dialogue ever occurred. To be clear, the Committee never agreed to any limitations on the scope of Mr. Black's interview that were not already articulated in the Committee's March 3 letter. Furthermore, you were informed that the Committee would cover any topic and use any document relevant to its investigation during the transcribed interview—as has been the practice during the totality of this investigation. The mere fact that a topic was not identified during good-faith discussions among counsel does not mean it falls outside the scope of the interview, because such discussions are inherently non-exhaustive. The Committee is not required to articulate in advance every item that is potentially pertinent to or within the scope of its investigation.

## II. Documents Used by the Committee

Your letter asserts that "Mr. Black's counsel understood the Majority staff to explain that they intended to focus the interview on information and documents in the public domain."[8] You then cited, specifically, to the Chairman's statement regarding NDAs and bank records reflecting certain alleged financial violations.[9] This framing can only be understood by the Committee as an intentional misrepresentation by you of the pre-interview discussions with the Committee. During the April 28 in-person meeting, the Committee informed you that if it were to enter documents into the record as exhibits during the interview, *most* of the documents already existed in the public domain. It appears Mr. Black's counsel misinterpreted this statement to mean that *all* documents to be entered into the record—and based on your letter that all questions posed—by the Committee would exist in or come from the public domain. That was never the case. Indeed, the expectation that questioners would likely "focus on" publicly available documents does not equate to an assurance or promise that the Committee would *only* enter into the record or refer to public documents. The Committee was well within its rights to enter into the record or question the witness about any document—whether publicly disclosed or not—that pertained to its investigation as it has done through investigations not only in the current Congress, but also in past Congresses.

Additionally, the discussion about the use of documents in the transcribed interview did not center around the totality of documents to be used and their origins, but rather around the fact that you requested that the Committee share exhibits in advance of the interview. The Committee was very clear in its response; it would not share exhibits in advance consistent with its practice during this investigation.

---

[6] Letter from James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (Mar. 3, 2026).
[7] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[8] *Id.*
[9] *Id.*

Further, your statement that the Committee's emphasis on non-disclosure agreements and records regarding alleged bank violations are "directly at odds with representations made by the Majority staff"[10] is erroneous. In addition to making no such representation related to non-disclosure agreements and bank records, the likelihood that the Committee would inquire about non-disclosure agreements and bank records should have been apparent to you and your client considering the Committee's extensively transparent coverage of these topics throughout this investigation. Prior to Mr. Black's interview, the Committee made public the letter it sent to the U.S. Department of the Treasury on August 31, 2025, requesting bank records pertaining to Mr. Epstein and Ms. Maxwell.[11] The Committee made public two more letters it sent on November 18, 2025, to both JPMorgan Chase & Co. and Deutsche Bank AG requesting certain financial records related to Ms. Epstein and Ms. Maxwell as former clients of these institutions.[12] The Committee also inquired about non-disclosure agreements related to Jeffrey Epstein, Ghislaine Maxwell, and their associates in the transcribed interviews of another witness, the transcript of which was made public, prior to Mr. Black's transcribed interview.[13] Your claim that your client did not anticipate the Committee's use of such documents or the questions posed is simply not plausible, and even if it were a true misapprehension on your part, would not result from the fault of the Committee or its staff.

## III. Questions About Payments to Epstein

You are also concerned that the Committee did not ask your client "any questions during the June 26 transcribed interview about payments [to Mr. Epstein]."[14] This argument lacks both context and merit. The Committee was less than one hour into its interview when your client began refusing to answer important questions. Had your client not refused to answer questions and not chosen to terminate the interview after being served the document and deposition subpoenas, the Committee would have continued with its questioning for multiple rounds. Rest assured, the topic of Mr. Black's payments to Mr. Epstein would have been thoroughly covered, notwithstanding your client's refusal to answer the Committee's other pertinent questions. To take issue with questions the Committee did or did not address during a single round of the transcribed interview—which was replete with legal arguments—before Mr. Black ended the interview is incredibly disingenuous.

## IV. Refusal to Answer Questions about Personal Matters

On June 22, Mr. Black's counsel communicated on another call to the Committee that "… Mr. Black would respectfully decline to answer questions that related solely to his personal life."[15] Not only was this new information conveyed to the Committee just four days prior to his transcribed interview, but it was also the first time the Committee had been informed of any

---

[10] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[11] Letter from James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (Aug. 31, 2025).
[12] Letter from James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (Nov. 18, 2025).
[13] Transcribed Interview of William H. Gates, at 71:21-25, 72:1-3 (June 10, 2026).
[14] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[15] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).

limitations about what your client was willing to discuss in a voluntary setting. This limitation did not arise from any agreement with the Committee, nor was it a result of any waiver of the scope of the Committee's investigation.

Your own July 24 letter characterized the Committee's response by saying, "[t]he Majority staff represented that [your client's refusal to answer questions] would be problematic insofar as it would seem to exclude responding to questions regarding whether Mr. Black had a sexual relationship with a woman that the Committee believed might be tied to Epstein."[16] Your letter then failed to dispute that response and instead argued that "Mr. Black was not asked such a specific question" during the transcribed interview.[17] Not only does your argument fail to negate the Committee's position, but it relies on a categorically false assertion, and, yet again, is missing context.

During the interview of your client, the Committee asked the following questions pertaining to Mr. Black's sexual relationship with a woman associated with Mr. Epstein:

| | |
|---|---|
| **Mr. Leon Black (June 26, 2026)** | |
| Q. | Have you ever engaged in sexual conduct of any kind with Ms. Ganieva? |
| A. | I had an affair with her on and off for 6 years, an extramarital consensual adult affair with her.[18] |
| … | |
| Q. | Was Mr. Epstein involved in the negotiations on these terms? |
| A. | He was not involved in the negotiation. He was somebody that I told I was being blackmailed and extorted to, as well as to my lawyers at Paul, Weiss.[19] |

When the Committee made additional inquiries about this woman and the existence of a non-disclosure agreement between her and your client, your client refused to answer the Committee's questions.[20]

---

[16] *Id*.
[17] *Id*.
[18] Transcribed Interview of Leon Black, at 39:1-3 (June 26, 2026).
[19] *Id*. at 41:25, 42:1-2.
[20] Transcribed Interview of Leon Black, at 43-46.

## V. Non-Disclosure Agreements Are Within the Scope of Investigation

Your letter argues that "Majority staff never indicated to Mr. Black's counsel that confidential and legally binding agreements would be a subject covered in the interview."[21] To reiterate, the Committee did not agree to any limitations on scope for the interview and had previously inquired of several witnesses in this investigation about confidential and legally binding agreements. The Committee asked questions about what it deemed to be relevant to its investigation, which included questions about non-disclosure agreements signed by your client with women the Committee has reason to believe to be connected to Mr. Epstein—as was done with other voluntary witnesses in this investigation, whose interview transcripts are publicly available.[22]

Similarly, your assertion that "Majority staff then began asking questions that fell outside what Mr. Black's counsel understood to be a reasonable interpretation of the Committee's stated legislative purpose" is misguided.[23] It is the Committee that determines the scope of its inquiry, not the witness. Moreover, the Committee asked appropriate questions about the number of non-disclosure agreements to which your client was a party; whether there were other parties to the agreements; whether Mr. Epstein was involved in any such agreements; and whether your client knew about other individuals that possessed similar agreements that related to Mr. Epstein.[24] The reasons for the Committee's questions on this topic are twofold.

First, Mr. Epstein, and his associates, used a variety of tools to control his victims and other individuals in his orbit. The Committee is aware that Mr. Epstein used non-disclosure agreements to silence his associates, some of whom have since come forward as victims and survivors of his abuse. To conduct a complete and thorough investigation, the Committee will pursue all relevant avenues of inquiry. The Committee is also aware of the existence of at least one non-disclosure agreement between your client and a woman who was connected to Mr. Epstein. The pursuit of this investigative pathway—and relevant facts surrounding it—is necessary to determine the nature and extent to which Mr. Epstein and his associates used these confidential agreements, which in turn will help determine whether legislation is necessary and if so, how to craft such legislation to prevent such activity from reoccurring.

Second, the Committee's questions related to non-disclosure agreements more broadly are pertinent to the Committee's investigative purpose because of concerns regarding potential victims' association with these agreements. In a previous transcribed interview before this Committee, a witness was hesitant to answer questions about the identity of an individual with whom the witness was associated.[25] Upon disclosure of this individual's identity, the Committee immediately became aware of an existing connection between that individual and Mr. Epstein, of

---

[21] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[22] Transcribed Interview of Doug Band, at 125:24-25 (June 30, 2026); Transcribed Interview of William H. Gates, at 71:21-25, 72:1-3 (June 10, 2026).
[23] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[24] *See generally,* Transcribed Interview of Leon Black (June 26, 2026).
[25] Transcribed Interview of William H. Gates, at 34:22-25, 35:1-11 (June 10, 2026).

which the witness was not personally aware.[26] Your client claims not to be aware of any further connections between Mr. Epstein and other parties to his agreements, but the Committee must inquire about the details of such agreements to conduct a complete and thorough investigation. It is not the Committee's prerogative to take a witness's personal belief or assertion as an absolute, proven fact that is merely stipulated or left otherwise unexplored—the Committee must gather relevant information to draw evidence-supported conclusions to support its legislative prerogatives.

Ultimately, it is the Committee—not you and your client—that will determine the value and relevance of information your client has regarding the Committee's investigation into the actions of Mr. Epstein, Ms. Maxwell, and their associates.

You also take issue with the Committee's specific request for "[a]ll non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell are referenced…"[27] You argue that "these requests call for information beyond the scope of this Committee's investigation…"[28] The Committee disagrees. If either Mr. Epstein or Ms. Maxwell was associated with a party in a non-disclosure agreement to which your client, Mr. Black, is a party, these documents would be directly relevant to the Committee's investigation into Mr. Epstein and Ms. Maxwell. Furthermore, non-disclosure agreements with individuals who may have had a connection with Mr. Epstein or Ms. Maxwell, regardless of your client's knowledge of their connection, are relevant to the Committee's investigation. As stated above, your client's records may highlight a new individual of value to the Committee's inquiry or provide evidence necessary for the Committee's consideration of policy or other legislative changes.

In defense of your production of a singular non-disclosure agreement, you argue that "to the extent any more such confidentiality agreements exist, they would have been negotiated…well after Epstein's death."[29] However, the fact that Mr. Black may have entered into other confidentiality agreements, after Epstein's death, is not determinative of their relevance (or lack thereof) to the Committee's investigation. Agreements signed after Mr. Epstein's death could still involve his victims and relate to conduct in which Mr. Epstein was engaged. Further, Mr. Black's argument is inapplicable to the involvement of Maxwell in any agreement, as she is alive and a subject of this investigation. The subject of a subpoena does not have the right to decide what documents are responsive to, or within the scope of, any subpoena duly issued by Congress,[30] or their relevance to a valid legislative purpose. For these reasons, the remaining documents are crucial to this investigation, and the Committee must decide the investigative value of such documents during the Committee's investigation.

Finally, while the Committee acknowledges your concerns about the private nature of the contracts, Congress's legislative prerogatives and need for information to legislate are not

---

[26] *Id*. at 76:17-24, 77:2-6 (June 10, 2026).
[27] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[28] *Id*.
[29] *Id*.
[30] *Eisler v. United States*, 170 F.2d 273 (D.C. Cir. 1948); *See also*, *United States v. Hintz*, 193 F.Supp. 325 (N.D. Ill. 1961).

limited by the confidential terms of a private non-disclosure agreement. Your co-counsel, Ms. Estrich, agrees with this sentiment, as she emphasized that Mr. Black "ha[d] not received a subpoena," but that if he had, Mr. Black and counsel would have treated the situation differently.[31]

During the transcribed interview your client refused to answer nearly a dozen questions on the topic of non-disclosure agreements, which[32] led to the issuance of two subpoenas: one for your client's appearance at a deposition on the since-scheduled date of September 3; and the other that requires your client to produce the following documents:

1. All non-disclosure agreements to which Leon David Black is a party.

2. All non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell is or was a party.

3. All non-disclosure agreements to which Jeffrey Epstein or Ghislaine Maxwell are referenced or were involved in the preparation, execution, or enforcement thereof.[33]

The Committee engaged on another call with you on August 11 to further discuss the document and deposition subpoenas. On this call, you indicated that it is Mr. Black's intention to "find common ground on a path forward."[34] The Committee completely agrees. To the extent that other NDAs or confidentiality agreements exist, the Committee again reiterated the requirement to provide context and clarification, and for you to seek rational accommodations where appropriate.[35] Additionally, during the August 11 meeting you reiterated a point addressed in your July 24 letter that "[t]o the extent any more confidentiality agreements exist, they would have been negotiated…well after Epstein's death…"[36] In fact, you stated that any hypothetical counterparty was "abundantly clear"[37] that Mr. Black should not produce those agreements to the Committee because they do not wish to be part of the "small sliver"[38] of the role Mr. Black played in Jeffrey Epstein's life, dealings, and crimes. Mr. Black is the subject of the subpoena, and no other party dictates what he produces to the Committee. To yet again reiterate: the Committee requires such information to decide if any of these additional parties were connected to Jeffrey Epstein, are connected to Ghislaine Maxwell, or are connected to others of their associates. Thus, it is likely additional responsive documents are in the custody of your client, Mr. Black.

---

[31] *Id*. at 39:17-19.
[32] *See generally,* Transcribed Interview of Leon Black (June 26, 2026).
[33] Subpoena to Leon David Black (June 26, 2026).
[34] Microsoft Teams Call from Aaron Cutler, et al., to Daniel Ashworth, Gen. Counsel, H. Comm. on Oversight and Gov't Reform (Aug. 8, 2026, at 9:30AM).
[35] *Id*.
[36] Letter from Aaron Cutler to James Comer, Chairman, H. Comm. on Oversight and Gov't Reform (July 24, 2026).
[37] Microsoft Teams Call from Aaron Cutler, et al., to Daniel Ashworth, Gen. Counsel, H. Comm. on Oversight and Gov't Reform (Aug. 8, 2026, at 9:30AM).
[38] *Id*.

You and your client, Mr. Black do not possess the right to unilaterally determine which agreements he will produce in response to this Committee's subpoena for "*[a]ll* non-disclosure agreements."[39] The production of a singular non-disclosure agreement—after the Committee agreed to extend the deadline in good faith by two weeks—is insufficient to fulfill the requirements of this subpoena, considering your letter fails to articulate that there are no further non-disclosure agreements and seems to imply additional non-disclosure agreements exist. The Committee demands full compliance with the subpoena and rejects any attempts at further disrupting or delaying this investigation. Of course, if your client seeks reasonable accommodations or has scoping requests, the Committee—as is always the case—is prepared to review such requests. This is common practice in congressional negotiations, but to this point no such requests have been made.

During the August 11 meeting, the Committee asked, again, for you to confirm Mr. Black's appearance for his deposition on September 3, 2026—a date the Committee offered as an accommodation to Mr. Black's schedule and his need to prepare with his counsel. The Committee reiterated that Mr. Black was required to sit for his filmed, transcribed deposition in Washington, D.C. on September 3, and you indicated that he could appear on that date. Additionally, Committee counsel offered to accommodate Mr. Black to allow him to provide a privilege log of NDAs to which he is a party, in order to facilitate the production of responsive NDAs relevant to the Committee's investigation.

During the August 18 meeting, co-counsel for Mr. Black stated that he would not agree to provide a privilege log.[40] Additionally, co-counsel stated that Mr. Black would be willing to provide one additional NDA – the existence of which is publicly known due to litigation – in exchange for an agreement that the Committee: (1) agree not to hold Mr. Black in contempt related to either subpoena; (2) change the deposition subpoena to a voluntary transcribed interview; (3) limit the scope of the transcribed interview regarding confidentiality agreements to only the two NDAs Mr. Black was willing to provide; (4) delay the transcribed interview until late September or early October; and (5) not video record the transcribed interview. This offer is unreasonable, and if accepted, would result in responsive documents not being provided to the Committee and limits being placed on the Committee's ability to ask questions directly relevant to the Committee's investigation.

The Committee has been clear it would be willing to work with Mr. Black should he seek reasonable accommodations. For example, the Committee is willing to limit the scope of its subpoena for NDAs to the date on which Mr. Black met Jeffrey Epstein to present. Additionally, the Committee is willing to review *in camera* a privilege log listing the parties to NDAs he is involved with to identify those relevant to the Committee's investigation. At no point has Mr. Black sought a reasonable accommodation from the Committee, but rather he has consistently sought to dictate to the Committee the scope of its investigation.

---

[39] Subpoena to Leon David Black (June 26, 2026) (Emphasis added).
[40] Microsoft Teams Call from Aaron Cutler, et al., to Daniel Ashworth, Gen. Counsel, H. Comm. on Oversight and Gov't Reform (Aug. 18, 2026, at 10:30AM).

Mr. Black's continued refusal to comply with the Committee's legitimate subpoenas is unacceptable. If Mr. Black refuses to provide the Committee with responsive documents or refuses to appear for his scheduled deposition on September 3, 2026, the Committee will use all tools at its disposal, including contempt.

***

The Committee on Oversight and Government Reform is the principal oversight committee of the U.S. House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X.[41] If you have any questions, please contact Committee on Oversight and Government Reform Majority staff at (202) 225-5074.

Sincerely,

James Comer
Chairman
Committee on Oversight and Government Reform

cc: The Honorable Robert Garcia, Ranking Member
Committee on Oversight and Government Reform

[41] Rule X, cl. 4(c)(2), Rules of the U.S. House of Representatives, 119th Cong. (Jan. 16, 2025).