# Exhibit F

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,
U.S. HOUSE OF REPRESENTATIVES,
WASHINGTON, D.C.

INTERVIEW OF: LEON BLACK

Friday, June 26, 2026

Washington, D.C.

The interview in the above matter was held in room 2154, Rayburn House Office Building, commencing at 10:00 a.m.

Present: Representatives Comer, Garcia, Stansbury, Subramanyam, Walkinshaw, Ansari, Min,and Khanna.

Appearances:

For the COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM:

DANIEL ASHWORTH, GENERAL COUNSEL
STACY BAKER, DIRECTOR OF INFORMATION TECHNOLOGY
BRITTANY BRIGNAC, SENIOR COUNSEL
HANNAH CATHEY, PROFESSIONAL STAFF MEMBER
JESSICA COLLINS, COMMUNICATIONS DIRECTOR
JACK EMMER, CHIEF COUNSEL FOR INVESTIGATIONS
EMILY FEYERABEND, COUNSEL
ETHAN GOLDMAN, INTERN
BILLY GRANT, DEPUTY CHIEF COUNSEL FOR INVESTIGATIONS
NICHOLAS LANGMAN, UNDERGRADUATE FELLOW
MARK MARIN, STAFF DIRECTOR
ALEXANDER MCKENNA, INTERN
ELLISON TOLAN, COUNSEL
ASHLEE VINYARD, DEPUTY STAFF DIRECTOR
KEEN ZOLLER, UNDERGRADUATE FELLOW
[redacted]

[redacted]

For LEON BLACK:

Susan Estrich
Anya Goldin
Estrich Goldin

1 Aaron Cutler

2 Ari Fridman

3 Peter Spivack

4 David Sharfstein

5 Hogan Lovells

6

7 Whit Clay

8 Longacre Square Partners

Ms. Brignac. This is a transcribed interview of Mr. Leon Black conducted by the House Committee on Oversight and Government Reform under the authority granted to it pursuant to House Rule X.

Accordingly, House Rule X grants the Committee broad jurisdiction for the Committee to conduct investigations of any matter at any time.

This interview was requested by Chairman James Comer as part of the Committee's investigation into the circumstances and subsequent investigations into the crimes of Jeffrey Epstein and Ghislaine Maxwell, the operation of sex trafficking rings and ways for the Federal Government to effectively combat them, the ways in which Mr. Epstein and Ms. Maxwell sought to curry favor and exercise influence to protect their illegal activity, and potential violations of ethics rules related to elected officials.

Can the witness please state his name and spell his last name for the record?

Mr. Black. Leon Black. B-l-a-c-k.

Ms. Brignac. Thank you.

I want to thank Mr. Black for appearing here today.

My name is Brittany Brignac, and I am senior counsel for Chairman James Comer.

Under the Committee on Oversight and Government Reform's rules, you are allowed to have counsel present to advise you during this interview.

Do you have counsel representing you in a personal capacity present with you today?

Mr. Black. Yes, I do.

Ms. Brignac. Will all counsels please identify themselves for the record?

Ms. Estrich. Susan Estrich representing Mr. Black.

Mr. <u>Cutler.</u> Aaron Cutler representing Mr. Black from Hogan Lovells.

Mr. <u>Spivack.</u> And Peter Spivack representing Mr. Black.

Ms. <u>Brignac.</u> For the record, starting with the majority staff, can the additional staff members please introduce themselves with their name, title, and affiliation?

Mr. <u>Grant.</u> Billy Grant, deputy chief counsel for investigations for Chairman Comer.

Mr. <u>Emmer.</u> Jack Emmer, chief counsel for investigations for Chairman Comer.

Mr. <u>Ashworth.</u> Daniel Ashworth, general counsel for Chairman Comer.

Ms. <u>Feyerabend.</u> Emily Feyerabend, counsel for Chairman Comer.

Ms. <u>Cathey.</u> Hannah Cathey, professional staff member, Chairman Comer.

Ms. <u>Tolan.</u> Ellison Tolan, senior counsel, Chairman Comer.

Ms. <u>Baker.</u> Stacy Baker, director of information technology for Chairman Comer.

Ms. <u>Vinyard.</u> Ashlee Vinyard, deputy staff director, Chairman Comer.

Ms. <u>Collins.</u> Jessica Collins, communications director, Chairman Comer.

[redacted], chief counsel for Ranking Member Garcia.

[redacted], staff director for Ranking Member Garcia.

[redacted], fellow, Ranking Member Garcia.

[redacted], senior counsel, Ranking Member Garcia.

[redacted], senior counsel, Ranking Member Garcia.

[redacted], intern, Ranking Member Garcia.

[redacted], intern, Ranking Member Garcia.

[redacted], senior policy adviser, Ranking Member Garcia.

[redacted], professional staff member, Ranking Member Garcia.

[redacted], deputy press secretary, Ranking Member Garcia.

[redacted], press secretary, Ranking Member Garcia.

[redacted], deputy comms director, Ranking Member Garcia.

[redacted], staff member, Ranking Member Garcia.

[redacted], research assistant, Ranking Member Garcia.

[redacted], research analyst, Ranking Member Garcia.

Ms. Brignac. And we have majority members present.

Can the Chairman please introduce himself for the record?

Chairman Comer. James Comer, Chairman, Kentucky-1.

Ms. Brignac. And can all other counsels for the witness please introduce themselves for the record?

Mr. Sharfstein. David Sharfstein on behalf of Leon Black, Hogan Lovells.

Mr. Fridman. Ari Fridman with Hogan Lovells on behalf of Leon Black.

Ms. Goldin. Anya Goldin for Leon Black on behalf of Estrich Goldin.

Ms. Brignac. Mr. Black, before we begin, I would like to go over the ground rules for this interview.

The questioning will proceed in rounds. The majority will ask questions for up to an hour and then the minority will have an opportunity to ask questions for up to an hour if they choose. To the extent members have questions for the witness, they will be propounded during their side's respective rounds.

The clock will stop if you need to confer with counsel, your counsel is speaking, and when members or staff are speaking during the opposing side's round of questions. We will alternate back and forth until there are no more questions.

Do you understand?

Mr. Black. I do.

Ms. Brignac. There is a court reporter taking down everything I say and

everything you say to make a written record of this interview.

For the record to be clear, please wait until the staffer questioning you finishes each question before you begin your answer, and the staffer will wait until you finish your response before proceeding to the next question.

Further, to ensure the court reporter can properly record this interview, please speak clearly, concisely, and slowly.

Also, the court reporter cannot record nonverbal answers, such as nodding or shaking your head, so it is important that you answer each question with an audible, verbal answer.

Exhibits may be entered into the record. Majority exhibits will be identified numerically. Minority exhibits will be identified alphabetically.

Do you understand?

Mr. Black. I do.

Ms. Brignac. We want you to answer our questions in the most complete and truthful manner possible, so we will take our time.

If you have any questions or do not fully understand the question, please let us know. We will attempt to clarify, add context to it, or rephrase our questions.

If we ask about specific conversations or events in the past and you are unable to recall the exact words or details, you should testify to the substance of those conversations or events to the best of your recollection.

If you only recall a part of a conversation or event, you should give us your best recollection of those events or parts of conversations that you do recall.

Do you understand?

Mr. Black. I do.

Ms. Brignac. Although you are here voluntarily, you are required by law,

pursuant to Title 18 of the United States Code Section 1001, to answer questions from Congress truthfully. This also applies to questions posed by congressional staff in this interview.

Do you understand?

Mr. Black. I do.

Ms. Brignac. If at any time you knowingly make false statements, you could be subject to criminal prosecution.

Do you understand?

Mr. Black. I do.

Ms. Brignac. This includes both knowingly providing false testimony but also stating that you do not recall or remember something when, in fact, you do.

Do you understand?

Mr. Black. Yes.

Ms. Brignac. Furthermore, you cannot tell half-truths or exclude information necessary to make statements accurate. You are required to provide all information that would make your response truthful. A deliberate failure to disclose information can constitute a false statement.

Do you understand?

Mr. Black. I do.

Ms. Brignac. Is there any reason you are unable to provide truthful testimony in today's interview?

Mr. Black. No.

Ms. Brignac. Please note that if you wish to assert a privilege over any statement today, that assertion must comply with the rules of the Committee on Oversight and Government Reform.

Pursuant to that, Committee Rule 16(c)(1) states: "For the Chair to consider assertions of privilege over testimony or statements, witnesses or entities must clearly state the specific privilege being asserted and the reason for the assertion on or before the scheduled date of testimony or appearance."

Do you understand?

Mr. Black. I'm sorry. Can you repeat that last clause?

Ms. Brignac. Yes. 16(c)(1) states: "For the Chair to consider assertions of privilege over testimony or statements, witnesses or entities must clearly state the specific privilege being asserted and the reason for the assertion on or before the scheduled date of testimony or appearance."

Do you understand?

Mr. Black. Yes.

Ms. Brignac. Ordinarily, we take a 5-minute break at the end of each hour of questioning, but if you need a longer break or a break before that, please let us know, and we will be happy to accommodate.

However, to the extent that there is a pending question, we would ask that you finish answering the question before we take the break.

Do you understand?

Mr. Black. I do.

Ms. Brignac. Do you have any other questions before we begin?

Mr. Black. The only question I have is the questions that are addressed to me will only be by the people at the table or -- not everybody here? I'm a little hard of hearing. That's the only. So if people can speak up. I have hearing aids.

Ms. Brignac. Absolutely.

Mr. Black. Thank you.

Ms. Brignac. We will do our best to accommodate that. Thank you.

Mr. Black. Thank you. Okay.

Mr. Grant. And we've had a couple of additional members join us. Could they please introduce themselves for the record?

Ms. Stansbury. Melanie Stansbury, New Mexico-1.

Mr. Min. Dave Min, California.

Mr. Grant. Thank you.

Ms. Brignac. I understand, Mr. Black, you have an opening statement that you would like to read into the record. You can do so now.

Mr. Black. Thank you very much.

Chairman Comer, Ranking Member Garcia, Committee members, and Committee staff, I come here today voluntarily to set the record straight about my relationship with Jeffrey Epstein, and in particular why I paid him the money I did.

I knew Epstein for 18 years before I paid him a dime. When I first met Epstein in the mid-'90s, he was on the board of Rockefeller University, the greatest scientific research institution in the world, and also on the boards of the Council on Foreign Relations and the Trilateral Commission.

His network included respected luminaries such as David Rockefeller, Ehud Barak, who had been the Prime Minister of Israel, Larry Summers, George Mitchell, Bill Richardson, and Ace Greenberg.

By the time I first paid Epstein in 2013, I knew him to possess an unrivaled network of relationships with individuals in finance, academia, science, politics, and more, including Deepak Chopra, Tom Barrack, Tom Pritzker, Reid Hoffman, Kathy Ruemmler, who had been President Obama's personal attorney, Elon Musk, Sergey Brin, Bill Gates, President Bill Clinton, Peter Thiel, Steve Bannon, Ariane de Rothschild, Eric Kandel, who is

a Nobel Prize winner, Leon Botstein, who is head of Bard College, and numerous eminent scientists, as well as with many major financial institutions.

I also knew him to possess a remarkable acumen about tax, insurance, and trust and estate matters. I paid Epstein for his bona fide advice on these matters in addition to helping to manage and improve the operation of my nascent family office.

With the benefit of hindsight, I now know -- as does the world -- that Epstein was engaged in horrific, sordid activities. I feel terrible for Epstein's victims.

I want to state clearly that I did not know about this nefarious activity until Epstein was charged with trafficking in July 2019.

I did know that Epstein pleaded guilty in June 2008 to State charges relating to prostitution involving a minor. Epstein had told me that it was an isolated incident resulting from a fake ID.

Five years after his conviction, I gave Epstein a second chance, as did many others. I wish I had not.

With that context, let me state unequivocally that I have never abused a woman. I have never been with an underage woman. I have never engaged in sex trafficking. I have never paid Epstein for access to women. I was never blackmailed by Epstein. I was not involved with and had no knowledge of any of Epstein's heinous conduct.

My background. I am almost 75 years old. I am a husband, a father, and a grandfather. I am proudly Jewish. My father was a rabbi before becoming a businessman. My mother was a schoolteacher and also an artist. My sister was a schoolteacher.

From my family, I found much inspiration and resilience. These are things that I have shared with my children and now my grandchildren.

I am also a business builder, an investor, an art connoisseur, and a philanthropist.

I am a self-made businessman who has experienced much good fortune, and I have personally paid billions of dollars in taxes on the Federal, State, and local level.

When the first news accounts called out millions I had paid to Epstein, I was the chairman and CEO of Apollo Global Management, which I had founded and built for 30 years.

I am proud of the work that I did with many others at Apollo to invest and support companies in America and the world. I helped to create numerous businesses that are responsible for providing hundreds of thousands of good, well-paying jobs that American families depend on to pay their bills and realize their dreams.

Apollo also invested hundreds of billions of dollars in the American economy, including billions of dollars for labor union pension funds, which return billions of dollars to fund the retirements for millions of workers.

The reason I am here today is because of my unfortunate connection to Epstein, a man we all know now to be reprehensible.

I severed my connection to Epstein in 2018 after more than a year of increasing turmoil in our professional arrangements. After Epstein's arrest in 2019, we all came to know more about the demonic life he was leading. It was a life I knew nothing about.

In 2020, I asked for and fully cooperated with an independent investigation into my relationship with Epstein because I had nothing to hide.

Well-respected former prosecutors from the Southern District of New York who were at the Dechert law firm spent 3 months examining 60,000 documents and interviewing over 20 people. They had no limitations, no restrictions, and full access to all financial records and correspondence.

Their questions, on behalf of an independent committee of Apollo's board of directors, answerable to the shareholders and limited partners of Apollo, were

straightforward. How much did I pay Epstein? What did Epstein do on my behalf? Did he do work for Apollo at my behest? Did I know about the behavior that led to Epstein's arrest in 2019?

The Dechert law firm issued a report in January 2021 that answered each of these questions. That report was filed by Apollo as a public securities disclosure.

The fact of the matter is that I am the only person in Epstein's orbit -- including all the individuals who have been called to appear before this Committee -- who has been the subject of an independent investigation made at my request wherein the results were made public.

The Dechert report concluded that I had paid Epstein $158 million, and Dechert examined the services Epstein rendered and determined that Epstein performed highly valuable and legitimate tax and estate planning services for my family office, that the tax work was responsible for billions of dollars in savings, and that all of Epstein's work had been vetted by reputable law and accounting firms.

Dechert also found that Apollo never retained or did business with Epstein. The Dechert report also determined that I had no awareness of or involvement in any of Epstein's criminal activities. The rank speculation about me was proven to be just that -- rank speculation.

As I said earlier, I knew Epstein. I knew about his plea deal, which appeared to me and to most other observers -- and consistent with a relatively lenient sentence -- to have involved an isolated incident.

Epstein appeared to me and so many others to have redeemed himself. He served on several prestigious boards, hobnobbed with leading people in academia, the arts, business executives, and numerous world leaders.

And Epstein solved a massive estate problem for me that none of the experts and

lawyers I consulted with had been able to solve. It was a problem that would have destroyed enormous value for my family and also in Apollo, the company I had founded.

Epstein also told me that the fees I was paying him were tax-deductible 60-cent dollars, which I only learned years later was not true, i.e. what I believed to be $95 million of net fees paid to him over 5 years was actually $158 million. But at the time I was led to believe by Epstein that I was paying 60-cent dollars. That assurance was subsequently proved to be false.

With hindsight, I now see that Epstein exaggerated, embellished, manipulated, and outright lied prolifically and without concern for me or my family, and I now see that his deceit was not limited to me but also extended to numerous highly sophisticated individuals.

Epstein took credit for other people's ideas. He falsely claimed to have been involved in decisions -- in my decisions -- about investments. He asserted that he had influence over me. He said false and vicious things about my wife and children. He duped and deceived and he did so repeatedly.

In short, with the release of the Epstein files, I now appreciate the full extent to which Epstein was a despicable individual and an inveterate liar. This was a side of him I didn't know. I knew Jekyll. I didn't know Hyde.

Ultimately, in 2018, I fired Epstein after growing tired of his relentless pursuit of more and more money from me for professional services, his mistruths and misrepresentations regarding the 60-cent fee payments, and his failure to repay most of the $30 million demand loan that I had made to him.

I would have expected that the conclusions in the Dechert report would have definitively answered the questions about my involvement with Epstein, but that has not been the case, and the release of the Justice Department files has only added fuel to the

burning conspiracies and falsities that are at the core of speculation about Epstein.

I understand that, and I understand why people are upset, but I don't understand why people -- including members of this Committee -- would accept baseless speculation about me with regard to the facts and spin such ugly and vicious narratives that are demonstrably false.

I have been very publicly sued three times by a single law firm by three women claiming ties to Epstein and making horrific allegations about me.

This law firm, the Wigdor firm, brought these allegations to the Manhattan DA and the Department of Justice. I am told that there are intake forms that appear in the Justice Department files with heinous, fabricated allegations generated by this firm about me.

The media raced to cover these sensational allegations, taking them at face value, without conducting any investigation or undertaking even minimal diligence.

As a result of this torrent of lies and misrepresentations, I have received death threats, and my family now feels unsafe. For the first time in my life, I have had to deploy a bodyguard.

But those lawsuits were demonstrably baseless, and those allegations were entirely fabricated.

Of the three lawsuits that were filed, the first two have been dismissed with prejudice -- that means those lawsuits can never be brought again -- as the first plaintiff never met Epstein and her claims were wholly without merit. I never even met the second plaintiff.

In the third lawsuit, a Democratic Federal district judge, appointed by President Biden, last month issued a remarkable 76-page ruling sanctioning the plaintiff, the lawyer, and the law firm in question for outright lying and submitting false and fraudulent

evidence.

The plaintiff in that case had testified under oath -- incredibly -- that she gave birth to four of Epstein's children, three of whom were kidnapped at birth. She fabricated a journal where she made fantastical claims that she was raped by 50 different men when she was in high school, including a former President and multiple Cabinet members. She claimed to be a 16-year-old autistic woman with Mosaic Down syndrome.

Meanwhile, the law firm in question was expressly warned before filing that she was a fraud by class counsel, but they still proceeded to rely on her claims, knowing that they were entirely manufactured. Another Federal judge has found on the record that this plaintiff is not credible.

To be clear, I categorically deny the baseless and fabricated allegations in that case and in the other two lawsuits that were filed against me and that have now been dismissed.

Today, one of the lawyers at that firm who spearheaded this malicious campaign to destroy me has been "retired," in quotes, and the firm has been sanctioned, but the media coverage of the dismissals has been dwarfed by the initial baseless and salacious coverage. Meanwhile, extraordinary damage has been done to me and my family.

In conclusion, I wish I had never met Epstein. I regret ever doing business with him. My association with him, the frivolous but destructive litigation, the endless rumor mill have created a toxic environment for my wife and family, which I deeply regret.

I will not add to that toxic environment today. I am here to voluntarily answer questions about the work that Epstein did for me and for the services for which I paid him.

I am not here to answer questions about my personal life, which would be hurtful

to my wife, children, and family, and I will not speak about the personal lives of adult women who have not chosen and do not deserve to be connected by me or anyone else to Epstein.

This is an opportunity for me and for my family to move forward with the productive and beneficial work that should be consuming us -- our commitment to advance worthy causes for society.

We have made more than a half a billion dollars in philanthropic gifts in several key areas, including funding health research, highlighted by the Melanoma Research Alliance of which we are the founders and largest donors.

The MRA has been at the vanguard of the immunotherapy revolution that has energized the entire field of oncology and created a new paradigm for how over 30 cancers and millions of patients are treated.

We also support organizations that help women in need. We support veterans and a program for loan forgiveness for mental healthcare workers in the New York City public health system.

Also of importance to us is our support for Jewish causes and the effort to end the scourge of anti-Semitism spreading across the globe. And we continue to be active in giving to support academia and the arts.

I am a proud American. We live in a great country where all things are possible. I am hopeful that the Committee will find my voluntary testimony useful.

Thank you.

With that background, I am glad to take your questions.

Mr. Grant. Thank you, Mr. Black.

And we've had additional Members of Congress join us. Can they please identify themselves for the record?

Mr. Subramanyam. Congressman Suhas Subramanyam, Virginia's 10th Congressional District.

Mr. Grant. Thank you.

Ms. Brignac. The time reads 10:27 a.m., and the majority's time will start now.

EXAMINATION

BY MS. BRIGNAC:

Q Mr. Black, let's begin by discussing your background.

Where were you born?

A New York City.

Q What year were you born?

A 1951.

Q What is your marital status?

A I've been married for 45 -- 44 years as of last week.

Q And who is your wife?

A My wife is Debra Black.

Q And you have children, correct?

A I have four children.

Q What is your educational background?

A I grew up in New York City. Went to Fieldston High School. I went to Dartmouth College. And I went to Harvard Business School.

Q And we will go into more detail later, but for now, can you briefly describe your professional career?

A My professional career is I spent 13 years at the investment bank known as Drexel Burnham Lambert. I was the head of the mergers and acquisitions department there and then the corporate finance department there.

When Drexel collapsed in early '90, I founded Apollo Global Management and was the chairman and CEO there for almost 31 years. I left. I retired there 5 years ago, basically, and have been running our family office called Elysium.

Q When did you begin work with Elysium?

A Well, I started Elysium while I was still at Apollo. But when I retired from Apollo, it kind of amped up.

Q What year did you begin your work with Elysium?

A I don't remember the specific year, but that family office was in existence probably for 3 or 4 years while I was still chairman at Apollo.

Q Thank you.

Tell me about the first time you interacted with Jeffrey Epstein.

A I met Epstein in the mid-'90s, either '95 or '96, at a lunch that I was having with a mutual friend of ours, which he then joined. That's when I first met him, and that was in New York City in the mid-'90s.

Q Who was the mutual friend?

A It was a man named Skip Stein. Elliot Stein.

Q How did you know Mr. Stein?

A I had known Mr. Stein for many years. He was an investor. He's a friend.

Q What was his relationship to Mr. Epstein?

A I think they were friends also.

Q How did you know that?

A Because he joined a lunch and said, "This is my friend Jeffrey Epstein that I want you to meet."

Q Did you know Mr. Epstein would be going to the lunch before?

A No.

Q What was the reason for him bringing Mr. Epstein to the lunch?
A I think he thought I would find him an interesting person.
Q Who else was present?
A No one.
Q What was discussed at the lunch?
A I don't remember. This was 30 years ago. It was the first meeting or introduction to a person. I don't recall at all what was discussed.
Q Was the purpose of the lunch to meet Mr. Epstein?
A Not to my knowledge. I have no idea.
Q Do you recall if it was a friendly lunch or the nature of the topics that were discussed?
A I think it was a totally friendly lunch, and I just don't remember what was discussed.
Q Why do you say it was totally friendly?
A Because it was a friend of Mr. Stein, who said, "I'd like you to meet a friend of mine." He sat down, joined us, and I didn't really think that much about it. But there was nothing unfriendly about it.
Q I asked you about the nature of the topics, and you said it was friendly. So was it personal?
A I'm telling you I don't recall what the conversation was about from 30 years ago.
Q Okay.
What did you know about Mr. Epstein prior to this lunch?
A Zero.
Q Did you hear any rumors about him?

A No, not that I can recall. He was an absolutely new person that a friend of mine said he was friends with and was interesting, period.

Q Did you do any background research before meeting him?

A I didn't know I was going to meet him, as I told you, so how could I have done background research?

Q What were your first impressions of him?

A Smart. Irreverent. That's all.

Q What did you understand his job to be?

A I didn't understand his job to be. I understood that he was somebody that Skip was introducing me to.

I mean, if somebody joined you for dinner and they brought along a friend or -- it wasn't that I had any understanding of him at the time.

Q Did you ever discover what his job was before seeking advice from him?

A Well, that's a different question, because I asked advice years later, and during that period, I did learn a lot more about him.

As I read in my opening statement, I learned that he was involved with a lot of prestigious institutions. As I said in the opening statement, I was impressed that he was on the board of Rockefeller University, put on that board by David Rockefeller, who was extremely esteemed and respected, and that institution was extremely esteemed and respected.

He was also on the Council on Foreign Relations. He was also on the Trilateral Commission. I learned over time that he had a pretty interesting network. I also learned that he was very smart about tax and estate matters in terms of -- yeah.

Mr. Grant. And, obviously, you came to learn this stuff about Mr. Epstein.

So you met him at this lunch in 1995, round figures. So when did you begin to

actually learn about Mr. Epstein and his past and what he did for a living? Did that take a couple of years? Did it take a few months? When would that have -- ballpark range?

Mr. Black. I don't remember. I learned that he had been a math teacher. I learned -- at Dalton School.

I learned that he was very friendly with Ace Greenberg and Jimmy Cayne, who were the chairs and president of Bear Stearns, and that he had worked at Bear Stearns and therefore he had some financial sophistication. I learned that they were very friendly with him and liked him.

And then, over time, I also learned that he had relationships with people in government. He was good friends with Ehud Barak, who had been the former Prime Minister of Israel. And, actually, I hired Ehud Barak as a consultant for Apollo for 2 years, retained him to handle global consultancy. So I would say I met him, really, through Epstein.

I learned that he was good friends with Larry Summers, who had been the Treasury Secretary. He had relationships, as I mentioned in the opening statement, with George Mitchell, with Bill Richardson.

He seemed to be very knowledgeable more and more about estate planning.

And as I said, I never retained him until 18 years after I had met him. So there was a lot of meetings that I had in the interim before I did. I mean --

BY MS. BRIGNAC:

Q So, Mr. Black --

A Yeah?

Q -- it sounds like you understood he was well connected. Did you understand him to be wealthy?

A I understood him to be an adviser to wealthy families. I knew he had

worked for Les Wexner at The Limited for many years.

I knew later that he also worked for the Rothschild family, but I don't think I knew that earlier on when you're asking about.

He basically said he had done tax work and estate planning work for half a dozen or so families but was not at liberty to tell me other than Wexner.

Q And you listed quite a lot of information about him. How did you come to learn all of that information after meeting him at that lunch?

A I think a lot of it from him. A lot of it -- oftentimes, when I spent time with him, he also had other people come to those meetings. He actually introduced me to a lot of interesting people over the years.

You have to understand -- and this is something -- right now -- and, by the way, I should say I'm in no way defending him. But, clearly, everything that's known about him in the last 5 years is that this was a horrific, reprehensible, criminal pedophile.

But in those earlier years, before any of that was known, he was also a very interesting person. He had dinners. He'd have cocktails for three or four people.

He'd call me up and say, "Hey, I'm having this Nobel Prize winner over for a drink. Do you want to join? You'll find him interesting. Why don't you meet this fellow Larsen from Norway who helped put together the Oslo Accords? I think you'll find him interesting."

He had a dinner for Woody Allen and Dick Cavett. Did I want to join?

He had something for magicians where he had three of the world's most famous magicians there. "If you're around, would you like to join?"

He'd have -- that's where I met Bill Gates. He brought him up to my office to talk about philanthropy for 2 hours. That's where I met Elon Musk. That's where I met Deepak Chopra.

This was somebody who had an interesting Rolodex in many different areas, whether it be science, whether it be academia, whether it be politics, government, business.

So when you say how did I learn, I learned oftentimes by being there at meetings, whether it was with Kathy Ruemmler, whether it was with Steve Bannon, whether it was with Larry Summers.

Q It sounds like you admired him, Mr. Black.

A I said I don't want to look like I was -- I'm defending him. I'm not, given with hindsight what we all know about him.

But what we don't know about him is that he was also an interesting person who had a lot of -- a network of really interesting people.

Q How did your relationship develop over the years? Are there years you were closer than others?

A I don't know how to answer that. I think it was a -- it was a progressive. When you know somebody for 25 years, you know them more when you meet with them.

Q How often did you communicate with him?

A I communicated with him in the early years not that much. When I became convinced that he had done a lot for the family -- Les Wexner's family -- I had also asked him to be involved in putting together my family foundation. So we talked a little bit about that. That would have been in the early 2000s.

Q Who told you about his work with Les Wexner?

A He did.

Q What did he tell you?

A That he was -- had been very involved with him and that managed a lot of his strategies and tax, estate planning, and he was pretty intimately involved with him.

Q And, back at the lunch, did you exchange contact information there?
A Which lunch?
Q The lunch where you met Mr. Epstein. Did you exchange contact information?
A I don't know if it was exchanged. I certainly knew that if I wanted to get in touch with him, I could through Skip. So I have no idea whether we exchanged information. I just don't have memory of that.
Q What was the typical method of your communication with him throughout the years? Was it through associates of yours? Was it directly?
A I think there was some texting. I did not email. He was a rabid emailer, so he -- as you know with the 4 million emails that are in the Epstein files that have been downloaded.
But I never emailed. But I did receive emails. That's why -- when I mentioned the Dechert report, they reviewed 60,000 emails, and that usually came through my assistant who then printed out the emails for me.
Q Which associates of yours would communicate with Mr. Epstein?
A Well, I had a family office -- as I mentioned, a nascent family office -- where I had a number of associates in it who were people in the tax department and the accounting department and some in legal handling trusts. I think they all had communications with him.
Q Mr. Black, you brought up the Dechert report. Can you explain what the Dechert report is?
A Of course. Dechert is a major law firm run by Andy Levander whose background is as a prosecutor. And when The New York Times in, I think, the fall of 2020 wrote a story that I had paid Epstein 50 to 75 million dollars for professional

services, it became a big PR event.

And since Apollo dealt with many investors -- including investors from public pension funds, State pension funds, sovereign accounts -- I felt that we ought to, as a firm, and that me, as a person -- the chairman and CEO of the firm -- should address the questions that were brought up through that story.

So I went to the independent committee on the board, the board members, and requested that they go out and retain an independent law firm to examine my relationship with Epstein, because, as I said in the opening statement, I had nothing to hide.

And so Dechert spent 3 to 4 months reviewing 60,000 documents. They had no restrictions on them. It was no holds barred. I fully cooperated with that, as did 20 other people that they interviewed, to write a report to the board.

That Dechert report found a number of things. They found that I paid him not 50 to 75 million, but that I paid him $158 million over a 5-year period from '13 through '17 and that it was all for legitimate business purposes, that he had saved me between 1 and 2 billion dollars, that it was all vetted -- everything he did -- by major law and accounting firms, and that what I paid him on an after-tax basis -- which is what I believed I was paying, as I mentioned -- was akin to a 5 percent commission on what he had saved me.

And it also found, importantly, that I had no knowledge of or did not participate in any way with any of his criminal behavior.

Q Mr. Black, I'm going to ask at this stage that you try to be respectful of our time and your own. We do want to get you out of here at a reasonable hour, and we have a lot of questions. So I'm going to ask that you answer the questions that I'm asking you.

You mentioned an independent --

A Didn't I just do that when you asked me what was the Dechert report?
Q Excuse me.
Mr. Cutler. He did. He answered the question.
Ms. Brignac. Thank you. Thank you. Just wanted to make a note.
Mr. Black. Okay.
BY MS. BRIGNAC:
Q You mentioned an independent committee. Who were the members of this Conflicts Committee?
A One was Buzzy Krongard, who had been either the -- he was the head of a bank in Baltimore, had been on the board for many years, and he was either the number two or number three at the CIA. Number one.
Number two, there was a man named Ducey who had been the chair of an Apollo company earlier that had been subsequently sold.
And, three, there was a woman. Oh, my goodness. Having a senior moment.
Q Pauline Richards?
A Yes.
Q Have any of those --
Ms. Estrich. Thank you.
Mr. Black. Who was involved, I think, in the -- in a Caribbean island, and she had been -- she was pretty sophisticated from a financial point of view.
BY MS. BRIGNAC:
Q Have any of those members you just listed have any association with Jeffrey Epstein?
A Not that I'm aware of.
Q Were you involved in any way in Apollo's decision to hire Dechert?

A No, I was not.
Q You mentioned Andy -- Andrew Levander led the investigation. Is that correct?
A Yes.
Q How did you meet Mr. Levander?
A I didn't really know Mr. Levander. He led -- he interviewed me, I know, as part of that investigation.
Q Are you aware that Mr. Levander is reported to have known Mr. Epstein when he was an Assistant U.S. Attorney in the Southern District of New York in the 1980s?
A No.
Q Were you aware of any relationship between Mr. Levander and Mr. Epstein?
A No.
Q Upon hearing what I just said, do you find it concerning that Mr. Levander had a relationship with Mr. Epstein?
A No. Why? What was the relationship? I don't know what the nature of the relationship was.
Q They had a relationship. Do you find it concerning --
A Were they good friends or was one investigating the other?
Q I'm going to ask --
A I just don't know.
Q I'm going to ask that I finish my question before you answer.
A Please. Please. Sorry.
Q Do you find it concerning that this independent investigatory panel selected a person who you now know had an investigation -- or had a relationship with

Mr. Epstein -- to conduct your investigation of your ties with Mr. Epstein?
A I find it impossible to answer your question without knowing the nature of that relationship.
Q Do you find the fact that they had a relationship concerning?
A No, I don't. I don't. If they were good friends, then it would be concerning. If he had investigated Epstein for something prior years before, then I don't find it concerning.
But you need to -- I mean, it's -- it's difficult to answer that question without knowing the nature of what that relationship was.
Q Did any members of the Conflicts Committee personally benefit from your name being cleared of wrongdoing by the Dechert report?
A No.
Q Do you know Earl Nemser, an attorney for Dechert?
A No.
Q Okay.
Returning to your relationship with Mr. Epstein, did you socialize with Mr. Epstein in a personal capacity?
A Well, I just told you that -- well, why don't I elaborate. Thank you for asking that question.
I knew Mr. Epstein basically in two ways.
One, he performed professional services for my family office, and that involved helping put together the family office -- which was making a lot of mistakes, because, as I said, it was kind of nascent -- but also with a lot of very beneficial tax and estate planning services.
I also knew him, as I said, because he had an extraordinary Rolodex of people in

many fields. And as I said, if you want to call that social, I guess that would be social.

When he called and said, "Would you like to meet this interesting person?" or during U.N. Week where dozens of people from all over the world would come to his townhouse and say, "Would you like to join us? You'll find these people interesting," I did.

So, from that point of view, I guess you could say I socialized because I met scientists through him. I met people involved in government through him and business, because I went over and joined him for a drink at his townhouse when they were there.

So, from that point of view, I would say it was dual. One, it was professional, and two, I enjoyed taking advantage of all the network of interesting people he knew.

Q What is the Debra and Leon Black Family Foundation?

A I'm not sure. I think it was something set up early. There have been many -- there has been an evolution of a lot of names. We have a few billion dollars today that we're involved with, with philanthropy. But it started off smaller. But we've always been interested in philanthropic work. We wanted to get our children involved in that also.

And so I think -- and I don't want to speculate exactly what that was, but I think it was one of many entities, if you will, which was involved for our family for the trust to get involved in philanthropic activities.

Q Let me ask, then --

A But I'm speculating a little bit because I'm not sure.

Q Let me ask, then, which entity did you and your wife appoint Mr. Epstein to the board of directors of in 1997?

A I think that was the name of it.

Q Why did you place Mr. Epstein on the board in 1997?

A Because I thought he was really smart in areas having to do with trusts and foundations and charitable work.
Q And this was only a year or two after having met him, correct?
A It was a couple years, yeah. Exactly.
Q And this appointment caused you to confide personal details about your financial matters and your family with Mr. Epstein, correct?
A Yes.
Q Did anyone push back on this appointment?
A Not that I can recall.
Q And how long had -- how long did he serve on the Black Family Foundation?
A I think for -- if you're saying it happened in '97 -- is that what you just mentioned?
Q Uh-huh.
A I think he was on it until he went to jail and was convicted and I asked him to come off it.
I would also just mention -- and I know you reminded me about time -- I don't think that entity did a whole lot.
Q Why ask Mr. Epstein to resign from the board when he was convicted?
A Because I thought it was appropriate if we had a family foundation and there were only three members on it -- my wife, myself, and him -- that he step back from it.
Q You've been quoted to say that his conviction was not that big of a deal to you, but it sounds like it did cause concern enough for you to take action in removing him from your family foundation.
A As I said, I don't think the family foundation did a lot. But it was something that was out there. It was public. It only had three members. He was in jail. And I

didn't think that that was the family foundation appropriate.

Q So then 2007, we've covered about a decade of dealings between you and Mr. Epstein. How frequently over that decade did you interact with him?

A It's hard to say. But my home was two blocks from his townhouse. Sometimes we would have breakfast together, and sometimes I'd go over, if he had interesting people for drinks, at 5:00 or 6:00 for an hour or an hour and a half. Maybe -- I don't know -- once a month, once every 3 weeks, something like that.

[11:00 a.m.]

BY MS. BRIGNAC:

Q And we can agree you developed a friendship over these years. Yes?

A Friendship is an amorphous term. This is somebody who knew intimately the goings on in my family tax and estate planning entities. It's also something where, as I mentioned, I'd go over and meet his friends. I know there are emails where he claims that we're best friends. We were never best friends. Was I friendly with him from the point of view of enjoying his Rolodex? Yes. Did I think he was very smart as a professional adviser? Yes.

[Black Majority Exhibit No. 1
was marked for identification.]

BY MS. BRIGNAC:

Q I would now like to enter what is marked as majority exhibit 1. This is a letter from a book that was compiled as a gift for Mr. Epstein's 50th birthday. I'll give you a moment to review.

A I'm aware of this.

Q And just let me know when we're ready.

A I'm ready. I said I'm aware -- I know this letter.

Q Who reached out to you and asked you to make this submission?

A I believe Ghislaine Maxwell.

Q What did she tell you?

A That she was putting together a surprise birthday book for Epstein's 50th and would I contribute to it, and I said sure.

Q Did she send you any other letters or examples done by others?

A Nope, but she said that she was putting together a book by others and would I contribute. So I knew there were others, but I didn't know who they were.
Q Your submission appears to be a poem of sorts. Yes?
A A bad poem, yes.
Q In the letter, you refer to Mr. Epstein as a VFPC, which means Vanity Fair Poster Child. What does that mean?
A It means, I believe -- I don't fully recall -- but I think there had been a Vanity Fair article about him. That's all.
Q What was that Vanity Fair article about?
A I don't remember, but that's what the reference is.
Q What did you mean when you wrote, "By Birds and by Bucks, Cs and Ms are his key?"
A I actually don't recall. I don't know what Buck -- I think it's a reference that he liked money, that he liked money and he liked women. He was a confirmed bachelor.
Q What did you mean by "Blond, red, or brunette spread out geographically?"
A What it says, that he liked women, whether they were blond, redheaded, or brunettes.
Q Which women were you referring to here?
A None specifically.
Q What locations were you referring to?
A I don't think I was.
Q Why would you say spread out geographically?
A Because he seemed to know women all over the world. He traveled. He was in Paris. He was in Santa Fe. He was in his island. And he enjoyed the company

of good-looking women, and he was a bachelor. Yeah.

Q How did you know he surrounded himself with good-looking women?

A Well, his staff were mostly good-looking women, and his pilot was a 6-foot blond. I mean, it was a little bit out of like a James Bond movie. His plane I think I remember being black, and his pilot was a 6-foot blond with her hair down to her waist. He was eccentric.

Q Who was this blond pilot?

A I don't really know her.

Q Have you since learned that her name was [redacted]?

A Yes.

Q Did you understand [redacted] to be Mr. Epstein's girlfriend?

A No. I still don't understand that. That's news to me.

Q Yes, it's been widely reported on.

Did he have multiple girlfriends at a time?

A I don't know a lot of his girlfriends. I know his last girlfriend, Karyna, but I didn't know -- and I knew he had been with somebody before I knew him for 10 years, but I didn't know his girlfriends. But I did know that he surrounded himself with good-looking women.

Q How old did [redacted] appear to be?

A I'm sorry, which one?

Q The blond pilot, [redacted], how old did she appear to be?

A I don't know. Thirty. I don't know.

Q Have you been made aware since --

A She was a registered pilot.

Q Have you been made aware since that [redacted] had been trafficked

to the United States at the age of 15 by Mr. Epstein?
A No, I didn't know.
Q Was it possible that [redacted] was underage?
A I don't believe so. I only met her when she was his pilot. I doubt whether she was an underage pilot.
Q Did you ever see her at 301 East 66th Street?
A No.
Q Further in the poem, you state "Alhambra East jamboree." What does that refer to?
A As I said, Epstein was quite eccentric and a little crazy with his architectural plans for his island, which he sometimes shared with me, and I think he had seven different buildings going on. They had an Asian or I'd say even more Mideastern architectural pendulum with domes, and so I called it the Eastern Alhambra based on the one in Spain. And he, I think, put a lot of time, effort, and money into building out those physical buildings.
Q The jamboree refers to a party or a celebration. Why would you say an architectural party or celebration?
A It's a poem. I mean --
Q For the record, does East Alhambra refer to East Alhambra High School in California?
A I didn't know one existed named East Alhambra. I have no idea. That's the first I've ever heard that.
Q You signed the birthday letter with the following, "Best of all, a Dear Friend. Happy Birthday, Jeffrey. Love and kisses, Leon."
A Uh-huh.

Q Did you consider Mr. Epstein to be a dear friend?
A No. I considered him to be what I've just described. I considered him to be somebody that I had known for a long time, enjoyed his entourage of people in a lot of different fields. I appreciated the work he had done with my family office, and I was in the spirit of what was asked of me, which was a festive occasion for the 50th birthday of a confirmed bachelor, and that was the spirit that I wrote this in. No, I told you before I didn't consider him my best friend or a dear friend. Was I friendly with him in terms of the amount of time I went over and met people at his townhouse? Yes, I was.
Q Your words, Mr. Leon, say that you called him a dear friend. So do you sign birthday letters to all of your business associates with love and kisses, dear friend?
A Sometimes.
Q Okay. Tell me about your first interaction with [redacted].
A I met her at a party in New York. Nothing through Jeffrey Epstein. Jeffrey Epstein didn't know her. She didn't know Jeffrey Epstein. So I met her at a different party in the city.
Q Who introduced you?
A She was at the party.
Q Whose party?
A A man named Don Engel, who had been a partner at Drexel.
Q How did he know [redacted]?
A I have no idea. He threw a party every year for independence day for Russian women, or something like that, and had a party of friends, and she was there and I chatted with her.
Q Where is she from?
A She was from Russia, from Tatarstan.

Q Have you ever engaged in sexual conduct of any kind with [redacted]?
A I had an affair with her on and off for 6 years, an extramarital consensual adult affair with her.
Q It was a sexual affair, correct?
A It's already -- it's public knowledge.
Q Did you have sexual conduct with [redacted]?
A Yes.
Q Did you support [redacted] financially over the course of this affair?
A Yes.
Q Did you ever ask [redacted] to sign a nondisclosure agreement?
A I think on the subject of NDAs I'm going to refer to my counsel.
Ms. Estrich. We're not going to get into NDAs without admitting the existence of any. Every confidential agreement I've ever seen in my long career has included confidentiality clauses that bind Mr. Black as well as the women involved.
Ms. Brignac. They don't bind them from Congress.
Ms. Estrich. Well, they bind them from a transcribed interview, as I understand it. This is not a subpoena. He has not received a subpoena, and we are treating this as a voluntary exercise in which Mr. Black is here voluntarily to help this committee, but we cannot get into NDAs. I would ask if you could move on to another question.
Mr. Ashworth. So he's not even going to answer questions about the existence of an NDA or whether or not -- not even the substance, and he is also not going to answer questions about the actions related to individuals who there may be an NDA related to?
Ms. Estrich. We'll answer any questions we can, but as you well know from your experience, if there were to be an NDA, it would have a confidentiality clause that would bind Mr. Black in a situation like this.

Mr. Ashworth. But it's your position that that confidentiality prevents him from even discussing the existence of an NDA?

Ms. Estrich. That is what every NDA I've ever seen in my career requires.

Mr. Ashworth. I think we would disagree with that.

Ms. Estrich. But the terms of the settlement agreement, if there is one, the existence of any such agreement. We're not even allowed when you have an NDA, to talk about the existence of an agreement in the absence of process and judicial review and the like. So we're going to try to abide by our confidentiality obligations while helping this committee in any way we can.

Mr. Ashworth. Okay. Thank you.

Ms. Estrich. Thank you.

Ms. Brignac. I understand this confidentiality to have already been broken because there is public reporting on this NDA, so I'm going to ask you, Mr. Black, did you ever ask [redacted] to sign a nondisclosure agreement?

Mr. Black. I think I'd like to chat with my counsel for 5 minutes.

Ms. Estrich. Could we take a short break?

Ms. Brignac. Yep. We can go off the record.

[Recess.]

Ms. Brignac. We can go back on the record.

Mr. Grant. Mr. Black, before you continue, there have been some additional Members of Congress and staff that have joined us since the beginning of this interview. Will they please announce themselves for the record.

Ms. Ansari. Yassamin Ansari.

Mr. Walkinshaw. James Walkinshaw.

[redacted] [redacted] comms director, Ranking Member Garcia.

[redacted] [redacted] intern, Ranking Member Garcia.

[redacted] [redacted], deputy chief counsel.

Mr. Grant. Thank you all.

Mr. Black. If I could, I will like to go back and respond to your last question.

BY MS. BRIGNAC:

Q Yes. Thank you. And I'm going to repeat the question so the record's clear.

Did you ever ask [redacted] to sign a nondisclosure agreement?

A Yeah. When I said I wanted to come back, I came here voluntarily to be cooperative with this committee, and to the extent I'm able to do that, I will. So on the three women that were the subject of lawsuits filed by the Wigdor firm, one of which was [redacted], I'm happy to respond to you relating to those three women.

So to answer your question, [redacted], who I'd had an on and off consensual adult affair with for 6 years, left the country. I think she had some visa issues after she finished her studies at Columbia University, and she was abroad for a year and then she came back. And she came back, and all of a sudden claimed that I had ruined her life, never claimed I had abused her, and that she had to have $100 million paid to her. And we spent a summer meeting probably seven or eight times. She came back in June and said that, and we spent the summer and spent about seven or eight meetings and worked out a settlement agreement which resulted in an NDA.

Q And pursuant to that NDA which was signed in 2015, you agreed on $100,000 per month for 15 years, $1 million in loan forgiveness, and $2 million in British pounds for a U.K. visa. Does all of that sound correct?

A That sounds correct.

Q Was Mr. Epstein involved in the negotiations on these terms?

A He was not involved in the negotiation. He was somebody that I told I was being blackmailed and extorted to, as well as to my lawyers at Paul, Weiss.

Q $21.7 million seems like an awful lot for an extramarital affair. What was it precisely you did not wish for her to disclose?

A That we were having an affair. I had a wife and children and was the chair of a public company. I agree with you it was a lot of money. It was a lot less than the $100 million that she started with. And I viewed it as total blackmail and extortion but didn't want it to be public, and so we negotiated a settlement.

Q And you sought Mr. Epstein's advice in navigating this NDA?

A I don't think how much he advised me. I don't need somebody to advise me on how to negotiate, but I did talk to him about being extorted. I mean, he was handling my estate. $100 million would have had an effect on the estate, and so he was aware of it, as was Paul, Weiss.

Q Did Mr. Epstein have experience navigating NDAs that caused you to speak with him about this?

A I don't know whether he had any experience on NDAs. He was not my NDA adviser.

Q And can you list the two other women that you have NDAs with that you mentioned you would speak about?

A Well, one is a woman named [redacted], and the other is someone I'm happy to talk about, but there's no NDA involved, and that's -- I think her name is still confidential and sealed. But all three of these women were clients of a firm called Wigdor who disgracefully brought charges that were totally fabricated and bogus against me.

Q What are the terms of your NDA with [redacted]?

A Again, I'm happy to talk about the firm -- or the woman. This is a woman I never met.

Q What were the terms of the NDA with [redacted]?

A Again, I'm not sure I'm going to talk about an NDA, but I am going to say I never met her.

Mr. Ashworth. Mr. Black, you stated just a moment ago that you would be willing to talk about the NDAs rela- -- these NDAs related to these cases. Now you're stating that you --

Mr. Black. I'm sorry, I didn't mean to interrupt you.

Mr. Ashworth. Now you're stating that you are not going to talk about the substance of those NDAs. I would like some clarity with regards to your position with regards to NDAs, both these specific -- these two as well as any other NDAs that may be relevant to the committee's investigation.

Mr. Black. Yeah. What I -- I may have misspoke. What I meant to say is I was willing to talk about these three women and those three cases, not so much the NDAs, which I think on advice of counsel --

Ms. Estrich. Mr. Black is simply not at liberty to talk about confidential terms and agreements where he has -- if he has an agreement that has confidential terms in it.

Mr. Ashworth. It seems bizarre that he could talk about these women and the potential cases against him that, it's at least our understanding from what he's articulated and what you've articulated, that those are specifically related to these NDAs, and so yet he can't talk about these NDAs or the substance of these NDAs, but he can talk about the women. It certainly indicates and raises questions as to the completeness of his testimony with regards to not only these women but these cases as it relates to the committee's investigation.

Ms. Estrich. We're doing our best. We're trying to do our best.

BY MS. BRIGNAC:

Q And the committee is aware of Mr. Epstein's involvement in assisting with NDAs for Mr. Black, so it is critical that we receive answers on NDAs.

So what were the terms of your NDAs with [redacted]?

A Mr. Epstein had no involvement with anything to do with [redacted].

Q That wasn't my question.

A No, but it is. You just said that Epstein was involved with the NDA. He was not.

Q You don't know that for certain.

A I do know. I never talked to him about [redacted].

Ms. Estrich. We know for certain that he was not involved with [redacted].

Mr. Black. Correct.

Ms. Brignac. Mr. Black, what were the terms of your NDA with [redacted]?

Mr. Black. Again, on advice of counsel, I'm not here --

Ms. Estrich. I can't answer.

Mr. Black. -- to talk about confidential NDAs, but you should be aware that those first two cases were withdrawn or dismissed with prejudice and they were totally fabricated and I never met [redacted].

BY MS. BRIGNAC:

Q You've also mentioned in a statement to the press that NDAs between men and women with prior relationships are very common occurrences among your social circles. Can you elaborate on that?

A I said that?

Q Yes. In a 2024 interview with Puck. "Leon Black From the Ashes." Are NDAs very common occurrences among your social circles?

A Do I know of many men who have signed NDAs? Yes, I do. And I think that there are many men and women who have had affairs and NDAs were arranged and they were meant to be kept confidential by both sides, the desire of both sides, and -- yeah.

Q How many NDAs are you a party to?

Ms. Estrich. Again, that's a question that if there are any NDAs we can't answer, because the terms of any NDA would include confidentiality as to the very existence of an agreement. So I have to instruct my client that he can't answer those questions consistent with his obligations.

Ms. Brignac. Noted.

BY MS. BRIGNAC:

Q Are you refusing to answer the question how many NDAs are you a party to?

A On the advice of my counsel, I am not going to answer that question.

Q How many NDAs was Mr. Epstein a party to?

A The only one that I think he was aware of, if there were any others, was [redacted], to my knowledge.

Q Mr. Epstein never told you he had an NDA with anyone else?

Ms. Estrich. Let me clarify. Did you ask the question how many NDAs did Mr. Epstein have or did Mr. Epstein know about Mr. Black's NDAs?

BY MS. BRIGNAC:

Q How many NDAs was Mr. Epstein a party to?

A I have no idea. How would I know that?

Q If he told you. If you saw them.

A No, he never told me that. I have no idea.

Q You confirmed that NDAs are very common occurrences among your social circles. Who has NDAs that you're aware of?

A I'm not here to talk about who has NDAs.

Q Are you refusing to answer the question?

A I'm refusing to answer that question, absolutely.

Q Are you aware of any other NDAs with women who are affiliated with Mr. Epstein?

A No.

Mr. Ashworth. Mr. Black, thank you again for appearing here today. My name is Daniel Ashworth. I'm the general counsel for the committee. I am serving right now two subpoenas to you, one for documents, all NDAs for which you are a party of or which relate to Jeffrey Epstein and Ghislaine Maxwell that you may have or in your possession. The second for a deposition on July 16th. I am serving these to you now. We will additionally provide electronic versions to your counsel immediately following this.

Ms. Estrich. We are happy to discuss this with you at the conclusion of this hearing and to deal with --

Mr. Cutler. Why don't we take a break now. We agreed to come here voluntarily today. We've had many discussions with you, and that's the terms of our sitting here for this, and so we're going to take a break now. Okay?

Mr. Ashworth. Understood. We'll go off the record.

[Recess.]

Mr. Ashworth. I understand Mr. Black or his attorneys have a statement they would like to make.

Mr. Cutler. Yes. Thank you.

I am deeply disappointed in the lack of professionalism displayed by the committee today. We engaged for months with the committee's majority staff in an effort to facilitate a fair, voluntary transcribed interview. Unfortunately, that good faith was met with premeditated political misdirection by the committee which served Mr. Black with subpoenas in an unprecedented manner after less than an hour of questioning and before they even asked a single question about his payments to Epstein.

Mr. Black came here voluntarily to assist the committee. This was nothing more than a planned political stunt. Mr. Epstein had no involvement with any NDAs, whether they exist or not. Let me reiterate, the committee did not ask a single question about the legitimate payments to Epstein for professional services on tax and estate matters.

I want to be clear, as Mr. Black said in his opening statement, he never abused a woman, he never was with an underage woman, he never engaged in sex trafficking, he never paid Epstein for access to women, he was never blackmailed by Epstein. Mr. Black had no knowledge of any of Epstein's heinous conduct.

Thank you.

[Witness and counsel leave the room.]

Mr. Ashworth. For the record, counsel did not engage with the committee or indicate to the committee any -- or provide any indication that Mr. Black would not testify or answer questions related to nondisclosure agreements.

Furthermore, for the first time on Monday, counsel for Mr. Black stated to the committee that he may not answer questions related to personal relationships. During that meeting, committee counsel indicated that there would be no limitations on scope for this interview. Furthermore, committee counsel has consistently indicated to Mr. Black's counsel that there would be no time or scope limitations on this interview.

Majority staff questions is finished. I understand that the minority would like to

make a statement.

[redacted] Thank you.

[redacted], senior counsel for Ranking Member Garcia. I have two statements for the record.

First, Ranking Member Garcia, Representative Khanna, and Representative Walkinshaw were all present during the last round but did not have the opportunity to introduce themselves.

Second, the minority had serious questions for Mr. Black about his knowledge of and involvement in Jeffrey Epstein's sex trafficking operation. Specifically, Democrats had questions about the vast amount of money Mr. Black paid Mr. Epstein and about the allegations of sexual abuse against Mr. Black. Mr. Black has shown himself unwilling to answer the committee's questions voluntarily, and so we strongly support Chairman Comer's subpoenas.

Mr. Ashworth. With that, we will go off the record.

[Whereupon, at 12:22 p.m., the interview was adjourned.]

Certificate of Deponent/Interviewee

I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

_______________________________

Witness Name

_______________________________

Date